**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| JAB Energy Solutions II, LLC[1] | Case No. 21-11226 (CTG) |
| Debtor. | **Re: D.I. 149**<br>**Proposed Cross-Motion Obj. Deadline:  At the time of the hearing**<br>**Proposed Cross-Motion Hearing Date:  Feb. 24, 2022 at 10:00 a.m. (EST)** |

**TURNKEY OFFSHORE PROJECT SERVICES, LLC'S AND OFFSHORE TECHNICAL
SOLUTIONS, LLC'S (I) PRELIMINARY OBJECTION TO DEBTOR'S MOTION FOR
APPROVAL OF SETTLEMENT AGREEMENT REGARDING DECOMMISSIONING
OF HIGH ISLAND A370 PROJECT [D.I. 149] AND (II) CROSS-MOTION FOR ENTRY
OF AN ORDER MODIFYING THE AUTOMATIC STAY**

Turnkey Offshore Project Services, LLC ("TOPS") and Offshore Technical Solutions,
LLC ("OTS," and together with TOPS, collectively the "Objecting Creditors"), hereby submit
this (i) preliminary objection (the "Preliminary Objection")[2] to the *Debtor's Motion for Approval
of Settlement Agreement Regarding Decommissioning of High Island A370 Project* [D.I. No.
149] (the "Settlement Motion"), seeking approval of that certain *High Island A370
Comprehensive Decommissioning Resolution Term Sheet* (the "Settlement Agreement"),
attached as Exhibit 1 to the proposed order submitted with the Settlement Motion as Exhibit A
thereto (the "Proposed Settlement Order"), filed by the above-captioned debtor and debtor in
possession (the "Debtor" or "JAB II") and (ii) cross-motion (the "Cross-Motion," and together
with the Preliminary Objection, collectively the "Objection and Cross-Motion") seeking entry of

---

[1]  The last four digits of the Debtor's U.S. tax identification number are 3625.  The Debtor's mailing address is
19221 I-45 South, Ste. 324, Shenandoah, TX 77385.

[2]  This objection is preliminary because discovery remains ongoing.  The Objecting Creditors reserve the right to
supplement this Preliminary Objection, including to add facts or argument based on facts learned in discovery.

an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant

to sections 105 and 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") and

rules 4001(a) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

modifying the automatic stay imposed by section 362 of the Bankruptcy Code.  In support of this

Objection and Cross-Motion, TOPS and OTS respectfully state as follows:

### PRELIMINARY STATEMENT[3]

1.      At the Final DIP Hearing in October, this Court made clear that all parties' rights

were reserved or preserved with respect to ownership and disposition of the Black Elk Funds, the

purported High Island Receivable and the unresolved disputes surrounding the same pending in

the EDLA District Court.  The Court recognized that these disputes were not ripe in the context

of the DIP Motion and must instead be resolved through a procedurally appropriate mechanism

in this or another court.  Rather than do as the Court instructed and pursue resolution of the

disputes, the Debtor is attempting to, once again, sidestep the ramifications of the Black Elk

Injunction by seeking approval of a "Settlement Agreement," which, for all intents and purposes,

*is* the Funding Agreement that is expressly subject to the Black Elk Injunction.  Indeed, the

Settlement Agreement incorporates the Funding Agreement, with its burdens and obligations,

almost entirely.   The Debtor continues to ignore the Black Elk Injunction because

acknowledging its binding effect on the Black Elk Funds and the Enjoined Parties would expose

its ultimate goal in filing this bankruptcy case:  to facilitate the transfer of the Black Elk Funds

into the pockets of its secured lenders.

---

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Motion, the Settlement Agreement, or the body of this Objection and Cross-Motion, as applicable.

2.      The Settlement Motion and the Settlement Agreement are fatally flawed and their approval should be denied.  In the first instance, any order approving the Settlement Agreement would stand as an unlawful collateral attack on the EDLA District Court's injunction.  As discussed below, the automatic stay and the procedural posture of the EDLA Proceeding have no impact on this result.  Similarly, because the Debtor is asking this Court to make findings related to the Black Elk Funds that will have no binding effect in the EDLA Proceeding, it is requesting an inappropriate advisory opinion from this Court thereby warranting its denial.  Moreover, even if this Court finds that the Black Elk Injunction does not apply (it does), the Settlement Agreement still should be denied as the Debtor fails to meet its evidentiary burden of demonstrating it is fair and equitable under the *Martin* factors.

3.      In addition, in conjunction with denial of the Settlement Motion, the Objecting Creditors file the Cross-Motion so that all necessary issues surrounding the Black Elk Funds can be finally determined by the EDLA District Court as the court most familiar with the parties' disputes.  While the Debtor has failed to bring the necessary proceeding to ripen these issues for the Court, this case and the parties cannot afford to allow these issues to linger any longer and, the Cross-Motion is the most efficient means for their resolution.  As shown below, the Objecting Creditors meet the standard for stay relief.

4.      For these and the other reasons discussed below the (i) Settlement Motion should be denied and (ii) Cross-Motion should be granted.

### STATEMENT UNDER LOCAL RULE 9013-1(f) AND (h)

5.      Pursuant to rule 9013-1(f) and (h) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, TOPS and OTS do not consent to the entry of a final order or judgment by this Court in connection with this

Objection and Cross-Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **GENERAL BACKGROUND**

### A.   **HI A370 and Related Facts**

6.      As noted in the *Declaration of Albert Altro, Chief Restructuring Officer in Support of the Debtor's Chapter 11 Petition and First Day Relief* [D.I. 24] (the "First Day Declaration"), the Debtor is involved with certain decommissioning and dismantling work for shut-in oil rigs in Louisiana and Texas.  These projects include the Breton Sound Project (as defined in the First Day Declaration) located off the coast of Louisiana and the High Island A370 (OCS-G 02334) offshore oil platform off the coast of Texas on the Outer Continental Shelf ("HI A370").

7.      HI A370, along with other projects, is subject to the bankruptcy proceeding pending in the United States Bankruptcy Court for the Southern District of Texas, captioned *In re Black Elk Energy Offshore Operations, LLC*, Case No. 15-34287 (MI) (the "Black Elk Proceedings").  Specifically, on June 27, 2016, the Honorable Marvin Isgur authorized Montco Oilfield Contractors, LLC ("Montco") to perform the dismantling and decommissioning of HI A370 pursuant to a certain Moncto Services Agreement.  *See Order Granting Joint Emergency Motion of W&T Offshore, Inc., Montco Oilfield Contractors, LLC and Black Elk Energy Offshore Operations, LLC to Authorize Plugging and Abandonment for High Island A-370 and Eugene Island 118*, Black Elk Proceedings [D.I. 1146] (the "HI A370 Order").[4]

---

[4]      The HI A370 Order is attached hereto as **Exhibit B**.

8.      Thereafter, Judge Isgur approved the assignment of Black Elk's remaining decommissioning obligations to Richard J. Schmidt, in his capacity as liquidating and litigating trustee to the Black Elk estate (the "Black Elk Trustee") under the terms of the Black Elk debtor's confirmed plan.  *See Order Confirming Third Amended Plan of Liquidation of Black Elk Offshore Operations, LLC*, Black Elk Proceedings [D.I. 1204] (the "Black Elk Confirmation Order").[5]

9.      Montco was unable to perform the work it was hired to do.  As a result, the Black Elk Trustee assigned the HI A370 project to JAB II.  *See Acknowledgment and Assignment of Master Services Agreement*, Black Elk Proceedings [D.I. 2089-1] (the "Acknowledgment and Assignment").[6]  Notwithstanding the size of the project, JAB II and the Black Elk Trustee agreed, pursuant to that certain High Island A370 Funding Term Sheet (the "Funding Agreement"),[7] that only $5.6 million in funds from the Black Elk estate would be allocated for the HI A370 project, and that a completion report by the Bureau of Safety and Environmental Enforcement ("BSEE") was a condition to payment for the project.  *See generally* Funding Agreement; *see also* First Day Declaration at ¶ 15.

10.     The Funding Agreement remains in effect and binding on the parties thereto, as spelled out in the Settlement Agreement:

> This [Settlement Agreement] is intended **to facilitate the consummation of the Funding Agreement** and, unless expressly stated herein, shall not be interpreted to effect an amendment of the Funding Agreement; provided that, upon

---

[5]      The Black Elk Confirmation Order, and accompanying plan, is attached hereto as **Exhibit C**.  Any exhibits accompanying the Black Elk Confirmation Order other than the plan have been omitted from **Exhibit C**.

[6]      The Acknowledgment and Assignment is attached hereto as **Exhibit D**.

[7]      The Funding Agreement is attached hereto as **Exhibit E** and to the Settlement Agreement as Exhibit A thereto [D.I. 149-2].

consummation of this [Settlement Agreement], this [Settlement Agreement] shall, only to the extent inconsistent with the Funding Agreement, supersede the Funding Agreement and the Parties' obligations thereunder.

*See* Settlement Agreement at 4 (emphasis added).

11.    Like Montco before it, JAB II was also incapable of completing the decommissioning work on HI A370.  Accordingly, following the assignment of the HI A370 project, JAB II solicited TOPS and OTS to perform the actual labor in dismantling the offshore drilling rig.[8]  As a result, in or around September 2020, TOPS and JAB II entered into that certain *Work Order 2020 No. 1* (the "TOPS Work Order")[9] under that certain *Master Service Agreement*, dated as of June 18, 2018 (the "TOPS MSA"),[10] whereby TOPS would complete the HI A370 project.  In or around October 2020, JAB II issued a purchase order for Project No. 2009-1766-P630 related to HI A370 to OTS (the "Purchase Order")[11] under that certain *Master Service Agreement*, dated as of June 26, 2018 (the "OTS MSA").[12]

12.    During the negotiations between JAB II and (i) TOPS on the Work Order and (ii) OTS on the Purchase Order, JAB II never informed either TOPS or OTS that (a) the decommissioning work and HI A370 were subject to the Black Elk Proceedings, (b) the Funding Agreement provided only limited funding for the project, (c) the BSEE completion report was a precondition of any payment and (d) subcontractors working on HI A370, including TOPS and

---

[8]    TOPS and OTS are aware of another subcontractor, C-Dive, LLC ("C-Dive"), being induced by JAB II to perform work on HI A370.  C-Dive has submitted a proof of claim in this case in the amount of $396,413.05.  *See* Proof of Claim No. 13.

[9]    The TOPS Work Order is attached hereto as **Exhibit F**.

[10]    The TOPS MSA is attached hereto as **Exhibit G**.

[11]    Invoices related to the Purchase Order are attached hereto as **Exhibit H**.

[12]    The OTS MSA is attached hereto as **Exhibit I**.

OTS, had no recourse if the price of the work exceeded the amount included in the Funding Agreement because the Debtor was otherwise unable to pay. Rather, the Debtor induced TOPS to perform the HI A370 project with a payment provision that compensated TOPS at a fixed daily rate knowing it lacked the ability to pay. *See generally* Work Order.

13.     About a month after entering into the Work Order and commencing its work, TOPS approached JAB II to pay the accrued amount of charges due on the HI A370 work, which was approximately $4 million. Only then did Brent Boudreaux, president of JAB II, inform TOPS of the Black Elk Proceedings, the existence and limitations of the Funding Agreement, and the precondition of receipt of the BSEE compliance report. Mr. Boudreaux further informed TOPS that it would refuse to make any payments until the HI A370 project was complete.

14.     In fact, JAB II "had no intention of honoring its time and materials contract at inception should the costs exceed the amount specified by the Black Elk funding agreement, which [JAB II] failed to disclose when entering into the contract." *See* Order and Reasons, *Turnkey Offshore Project Services, LLC v. JAB Energy Solutions, LLC* (the "EDLA Proceeding"), No. 2:21-cv-00672, ECF No. 36 (the "Black Elk Injunction").[13]

15.     Effectively stuck between the proverbial rock and a hard place, TOPS completed the decommissioning work on HI A370 in December 2020 and is now owed approximately $8.3 million on account of its work. *See* Proof of Claim No. 20. Like TOPS, JAB II also failed to honor invoices submitted under the terms of the OTS MSA in the amount of approximately $534K. *See* Proof of Claim No. 19; **Exhibit H**.

16.     Accordingly, TOPS initiated the EDLA Proceeding against JAB II in the United States District Court for the Eastern District of Louisiana (the "EDLA District Court"), asserting

---

[13]     The Black Elk Injunction is attached hereto as **Exhibit J**.

claims of breach of contract, fraud, and unjust enrichment, and seeking to recover the nearly $8.3 million in unpaid labor costs for performing all work related to and completing the HI A370 project. *See* EDLA Proceeding, Pl.'s Compl. & Pl.'s Am. Compl., ECF Nos. 1, 19.[14] OTS and C-Dive commenced similar actions against JAB II on or around that same time. *See* Offshore Tech. Sols., LLC v. JAB Energy Sols., LLC, No. 21-939 (E.D. La. filed May 12, 2021);[15] C-Dive, LLC v. JAB Energy Sols., LLC, No. 21-1426 (E.D. La. filed July 27, 2021).

17.     During the course of litigating the EDLA Proceeding but with no notice to TOPS, OTS or the District Court, JAB II entered into that certain *General Assignment* agreement with JABCO ABC LLC (the "Assignee"), and commenced an assignment for the benefit of creditors in the Court of Chancery for the State of Delaware, Case No. 2021-0492-LWW (the "ABC Proceeding"). First Day Declaration ¶ 7.

18.     Following the commencement of the ABC Proceeding, TOPS moved for an injunction in the EDLA Proceeding to enjoin JAB II and the Assignee from alienating the assets related to the HI A370 project after the payment was to be received by either one or both of them. On July 23, 2021, the Honorable Donna Phillips Currault, United States Magistrate Judge for the Eastern District of Louisiana, held a merits hearing on TOPS's motion for an injunction in the EDLA Proceeding. The EDLA District Court then requested further briefing from the parties on certain issues. Black Elk Injunction at 1.

19.     On August 10, 2021, after considering the record, the submissions, the written and oral arguments of counsel, and applicable law, the EDLA District Court granted in part and

---

[14]     A copy of the complaint from the EDLA Proceeding is attached hereto as **Exhibit K**.

[15]     A copy of the complaint in the action lodged by OTS against JAB II is attached hereto as **Exhibit L**.

denied part TOPS's motion.  Specifically, the EDLA District Court denied TOPS's request to freeze all of the assets of JAB II and the Assignee.  Black Elk Injunction at 33.

20.    However, Judge Currault found that TOPS had demonstrated a likelihood of success on the merits for its fraudulent inducement and unjust enrichment claims against JAB II. *Id.* at 23-25.  To this end, the EDLA District Court stated:

> To the limited extent that Plaintiff seeks to **freeze only the Black Elk funds held or controlled by Black Elk Trustee Richard Schmidt, W&T Offshore, Inc., Burlington Resources Offshore, Inc., Talos Energy, Inc., and/or Argonaut Insurance Company** and/or earmarked by the Black Elk bankruptcy court for the HI A370 work (the "Black Elk Funds"), which Plaintiff claims it was fraudulently induced into performing, *Deckert* allows this court to issue an injunction **to freeze those funds** pending resolution of this matter.

*Id.* at 32-33 (emphasis added).  Accordingly, the EDLA District Court granted TOPS's request for a preliminary injunction against those specific parties named in the order, including the Black Elk Trustee, W&T Offshore, Inc. ("W&T"), Talos Energy, Inc. ("Talos"), and Argonaut Insurance Company ("Argo," and together with the Black Elk Trustee, W&T, and Talos, collectively the "Enjoined Parties").

21.    There has been no order dissolving the Black Elk Injunction, and the Black Elk Injunction remains binding on the Enjoined Parties.

22.    On September 9, 2021, the EDLA Proceeding was "stayed and administratively closed" pending resolution of this bankruptcy case.  *See* EDLA Proceeding D.I. 48.[16]

**B.    The Debtor's Bankruptcy Proceeding**

23.    On September 7, 2021 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[16]    A copy of this order is attached hereto as **Exhibit M**.

24.     On September 27, 2021, the Debtor filed its *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 27] (the "DIP Motion").

25.     On October 5, 2021, the Debtor filed its Schedules of Assets and Liabilities for Non-Individuals [D.I. 54] (the "Schedules").  The Funding Agreement is not included on the Debtor's list of executory contracts and unexpired leases on Schedule G.  *See* Schedules at 17-18.  Moreover, the Debtor has not moved to assume or reject the Funding Agreement in this case.

26.     The Schedules also list the claim of the Texas Parks and Wildlife Department ("TPW," and together with the Debtor, BSEE and the Enjoined Parties, collectively the "Settlement Parties"), a party to the Settlement Agreement, as a general unsecured claim in an amount of $878,243.  Schedules at 15, Item 3.25.  The Debtor schedules the claim as "unliquidated" and "disputed," requiring TPW to file a proof of claim by March 7, 2022, under the order setting bar dates for proofs of claim [D.I. 122] (the "Bar Date Order").  *See* Bar Date Order ¶ 8 (requiring unliquidated and disputed claims to file a proof of claim by the applicable bar date including government units).

27.     On October 20, 2021, TOPS objected [D.I. 70] (the "TOPS DIP Objection") to approval of the relief requested in the DIP Motion on a final basis.  On October 21, 2021, OTS filed its joinder to the TOPS DIP Objection [D.I. 74] (the "OTS Joinder," and with the TOPS DIP Objection, collectively the "DIP Objection").  The Debtor replied to the DIP Objection [D.I. 80] (the "DIP Reply") on October 22, 2021.

28.     On October 25, 2021, the Court held a hearing on final approval of the DIP

Motion (the "<u>Final DIP Hearing</u>").  During the Final DIP Hearing, the Court acknowledged its

understanding of the pending disputes by and among the Debtor and the Objecting Creditors,

however it found that such disputes were not presently before the Court in the context of the DIP

Motion and preserved all parties' rights with respect to, among other things, whether the Black

Elk Funds are property of the Debtor's estate.  *See* Final DIP Hearing Trial Tr. 58:6-17 ("I don't

intend in entering the order to resolve the question whether the receivables that are referred as

the High Island project receivable or the Black Elk [Funds], are or are not property of the estate,

and I intend to reserve everyone's rights with respect to those funds.").  A subsequent order was

entered [D.I. 92] (the "<u>Final DIP Order</u>") on October 26, 2021, which included a formal

reservation of rights on these issues.  *See* Final DIP Order ¶ 32 (all rights are reserved "regarding

any dispute with respect to the estate's ownership, title, or interest in the funds referred to as the

High Island Project Receivable and/or the Black Elk Funds").

29.     On February 10, 2022, the Debtor filed the Settlement Motion.  The Settlement

Agreement purports to be a "resolution of all outstanding issues between the [parties] relating to

the High Island Project."  Settlement Motion ¶ 9.  Also, as noted above, the Settlement

Agreement fully incorporates the Funding Agreement and "is intended to facilitate the

consummation of the Funding Agreement."  Settlement Agreement at 4.

30.     Under the terms of the Settlement Agreement, the $5.6M of funds that was

originally available will be reduced to $5.2M after reduction of (i) the costs of escrow related to

the Settlement Agreement and (ii) the Reefing Fee, which is a fee payable to TPW in the same

amount as its scheduled "unliquidated" and "disputed" general unsecured claim.  *Id.*; *see also*

Settlement Agreement at 3.  Moreover, the Debtor also "intends to distribute the proceeds of the

High Island Receivable, after payment of the Carve-Out . . ., to repay the DIP Facility." Settlement Motion ¶ 9.

### **PRELIMINARY OBJECTION TO SETTLEMENT MOTION**

31.     The Settlement Motion and the Settlement Agreement are legally flawed on their face and cannot be approved by this Court.  In the first instance, the Settlement Motion and the relief it seeks is an unlawful collateral attack on the Black Elk Injunction pending in the EDLA Proceeding, and this Court lacks the ability to enter the Proposed Settlement Order in contravention thereof.  Even if the Black Elk Injunction can be modified or dissolved by this Court under the Proposed Settlement Order (it cannot), entry of such order would require this Court to issue an inappropriate and proscribed advisory opinion.  Finally, in addition to the Settlement Motion's and the Settlement Agreement's other deficiencies, the Debtor has not met and cannot meet its burden for approval of the Settlement Agreement under the *Martin* factors. For these reasons, and the reasons discussed below, the Court should deny the Settlement Motion.

**A.     The Settlement Agreement and the Proposed Settlement Order Violate the Black Elk Injunction and Cannot be Approved by this Court.**

> ***I.     The Settlement Agreement is an Impermissible Collateral Attack on the Black Elk Injunction***

32.     The Settlement Agreement and the Proposed Settlement Order cannot be approved because they stand as an impermissible collateral attack on the Black Elk Injunction. Accordingly, the Settlement Motion should be denied.

33.     It is black letter law that an injunction issued by one federal court cannot be collaterally attacked in another federal court.  *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (enforcing an injunction in bankruptcy court against a collateral attack in district court and stating "it is for the court of first instance to determine the question of the validity of the law,

and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected") (citing *Walker v. Birmingham*, 388 U.S. 307, 314 (1967) (quoting *Howat v. Kansas*, 258 U.S. 181, 189–190 (1922))); *Alley v. U.S. Dept. of Health and Human Servs.*, 590 F.3d 1195, 1205 (11th Cir. 2009) (reversing district court order because such order was a "collateral attack" on an injunction issued by another court); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir.1971) ("When a court is confronted with an action that would involve it in a serious interference with or usurpation of another court's "continuing power to supervise and modify its injunctions," "considerations of comity and orderly administration of justice demand that the non-rendering court should decline jurisdiction and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there.") (quotation marks, ellipsis, and citation omitted)).

34.     The Proposed Settlement Order is a collateral attack on the Black Elk Injunction in two equally important ways.  *First*, the Settlement Agreement implicates the specific assets enjoined under the Black Elk Injunction, i.e. the Black Elk Funds.  To that end, the Black Elk Injunction expressly "freeze[s] the Black Elk funds as described in the [Funding Agreement] and . . . enjoin[s] JAB II from dissipating or transferring any such funds received incident to the [Funding Agreement], as allocated for the HI A370 work in connection with the [Black Elk Proceeding] . . . ."  Black Elk Injunction at 33.  The "Black Elk funds as described in the [Funding Agreement]" are identical in amount to those in the Settlement Agreement.  For the convenience of the Court, a chart identifying the payment obligations of each Enjoined Party and the reference to such payment obligation in each respective agreement is below:

| Enjoined Party | Payment Obligation | Settlement Agreement | Funding Agreement |
|---|---|---|---|
| Talos | $1,196,874 | 5 | 2, 3[17] |
| Black Elk Trustee | $445,000 | 4 | 3 |
| W&T | $2,771,666 | 4 | 1 |
| Argo | $1,262,872 | 5 | 1 |

Because these particular assets are frozen under the Black Elk Injunction, an order cannot be entered by this Court that requires their transmittal.

35.     *Second*, the Settlement Agreement requires the Enjoined Parties to perform acts expressly enjoined by the Black Elk Injunction.  Federal Rule of Civil Procedure 65 requires every preliminary injunction to "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).  In compliance with federal law, the Black Elk Injunction "direct[s]" the Black Elk Trustee, W&T, Talos and Argo "to deliver any funds due under the [Funding Agreement] to [the EDLA District Court] in order to preserve the status quo pending resolution of this matter."   Black Elk Injunction at 34.   Contravening this mandate, the Settlement Agreement requires each Enjoined Party to deliver its respective payment obligation to an unidentified "Escrow Agent" upon satisfying certain conditions.  *See* Settlement Agreement at 4-5.  These acts would be in direct violation of the Black Elk Injunction,[18] and thus cannot be approved by this Court.

36.     Thus, the Proposed Settlement Order cannot be entered and the Settlement Agreement cannot be approved as they currently stand.  The Objecting Creditors respectively submit that the Proposed Settlement Order should be modified as to require that "all funds

---

[17]     Talos is to pay $1,096,874 for "Platform Work" and an additional $100,000 on account of a party named Fairways.

[18]     TOPS and OTS expressly reserve and preserve all of their rights against the Enjoined Parties in the EDLA Proceeding notwithstanding whether or not the Settlement Agreement is approved.

contemplated for payment of the HI work under the High Island Funding Term Sheet . . . be placed into the [EDLA District] Court's registry pending resolution of" the EDLA Proceeding, as required under the Black Elk Injunction.  Black Elk Injunction, p. 34.

> **II.**     ***The Procedural Posture of the EDLA Proceeding and the Automatic Stay Do Not Impact the Efficacy of the Black Elk Injunction***

37.     The procedural posture of the EDLA Proceeding and this bankruptcy case do not impact this result.  With respect to the EDLA Proceeding, the Debtor may argue (as it did previously in the context of defending the Final DIP Order) that the Black Elk Injunction is not "valid" because the EDLA Proceeding is "stayed and administratively closed."  *See* DIP Reply ¶ 30.  This argument is irrelevant and a red herring.  Indeed, "every circuit that has reached the question of the effect of an administrative closure has held that 'an administrative closing has no effect other than to remove a case from the court's active docket and permit transfer of records associated with the case to an appropriate storage repository.'"  *H.R. Bushman & Sons, Corp. v. Spud Packers, Inc.*, No. 4:06-CV-1638, 2008 WL 199548, at *1 (E.D. Mo. Jan. 22, 2008) (citing *Florida Ass'n for Retarded Citizens, Inc. v. Bush*, 246 F.3d 1296, 1298 (11th Cir. 2001) (quoting *Lehman v. Revolution Portfolio LLC*, 166 F.3d 389, 392 (1st Cir.1999)) (asking "Did the preliminary injunction remain in effect following my order administratively closing the case?" and answering in the affirmative); *see also Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir.2005) (stating "that the effect of an administrative closure is no different from a simple stay, except that it affects the count of active cases pending on the court's docket") (quoting *Mire v. Full Spectrum Lending Inc.,* 389 F.3d 163, 167 (5th Cir.2004)); *Penn West Ass., Inc. v. Cohen,* 371 F.3d 118, 126-27 (3rd Cir. 2004) (holding that a "procedural order of dismissal" was treated as administratively closing the case and that the sole legal consequence of the order was to remove

the case from the court's active docket).  Thus, the Black Elk Injunction remains in full force and effect and binding notwithstanding the procedural closing of the EDLA Proceeding.

38.     Similarly, this bankruptcy case and the automatic stay have no impact on the Black Elk Injunction.  Recall the EDLA District Court *denied* TOPS's requested injunction and freeze against the Debtor and its assets.  *See* Black Elk Injunction at 33 (denying request to freeze assets of the Debtor or the Trustee).  Instead, the Black Elk Injunction expressly implicates assets that are outside the control of the Debtor (i.e. the Black Elk Funds) and parties to the settlement that are <u>not</u> the Debtor (i.e. Black Elk Trustee, W&T, Talos and Argonaut).  By its plain terms, then, the Black Elk Injunction does not implicate the Debtor or the automatic stay; it exists independently and separately from this bankruptcy case and these proceedings.

39.     Consistent with the principles of comity discussed above, this Court and other bankruptcy courts have recognized and respected the efficacy of injunctions entered by other courts.  *See, e.g.*, *In re Scarborough-St. James Corp.*, 535 B.R. 60, 71-73 (Bankr. D. Del. 2015) (finding a state court injunction "remains in full effect" and that the bankruptcy court does not have the ability "to modify or dissolve the injunction"); *In re Dolen*, 265 B.R. 471 (Bankr. M.D. Fl. 2001) (finding that the automatic stay does not prohibit enforcement of a preliminary injunction asset freeze to the "extent that it freezes and prohibits the debtor's dissipation of assets in existence before the filing of the bankruptcy case that are related to the alleged fraud").  This Court should do so again here.

40.     *In re Scarborough-St. James Corp.*, 535 B.R. 60 (Bankr. D. Del. 2015) is particularly relevant here.  In that case, a landlord successfully obtained a prepetition preliminary injunction in a Michigan state court against the debtor prepetition regarding the debtor's rents. *Id.* at 65-66.  After filing its voluntary chapter 11 petition in this Court, the landlord moved for

relief from the automatic stay to proceed in the Michigan state court where the injunction was issued and for adequate protection. *Id.* at 67. The debtor opposed the relief and argued, among other things, that the Court should "ignore" the injunction and otherwise vacate it. *Id.* at 71. Overruling the debtor's positions, Judge Silverstein found the injunction was "still in effect" and that the Debtor failed to cite any applicable law that "purport[s] to give this Court the ability to modify or dissolve the injunction." *Id.* at 72. Instead, the Court found the particular property limited "in the hands of the debtor-in-possession as they were limited in the hands of the debtor." *Id.* (citing *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492-93 (3d Cir. 1997)); *see also In the Matter of Donald E. Sanders*, 969 F.2d 591, 593 (7th Cir. 1992) ("[A] trustee takes the property subject to the same restrictions that existed at the commencement of the case.").

41.     Like in *Scarborough*, the Debtor is seeking to impermissibly expand its rights in the Black Elk Funds in this bankruptcy case through the Settlement Agreement by ignoring the Black Elk Injunction that still remains in effect. This is not allowed under the law and therefore should be denied. *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1663 (2019) ("Whatever limitations on the debtor's property apply outside of bankruptcy [also] apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.") (internal quotations omitted); *Donald E. Sanders*, 969 F.2d at 593 ("Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest.") (citing *In re Silldorff*, 96 B.R. 859, 866 (C.D. Ill. 1989)); *In re Balay*, 113 B.R. 429, 445 (Bankr. N.D. Ill. 1990) ("To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate."); *Scarborough*, 535 B.R. at 72 (same).

**B.      The Proposed Settlement Order Requires this Court to Issue an Inappropriate Advisory Opinion.**

42.      Because the Black Elk Injunction remains in effect, this Court cannot enter the Proposed Settlement Order without issuing an inappropriate advisory opinion as to the merits of the EDLA Proceeding and the Black Elk Injunction.  For this basis alone, the Settlement Motion should be denied.

43.      Article III of the Constitution restricts the Judicial Power of the United States to "cases" and "controversies," and prevents federal courts from deciding "questions that cannot affect the rights of litigants in the case before them."  *Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. Corzine*, 606 F.3d 126, 129 (3d Cir. 2010) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)) (internal quotations omitted).  "To the extent a bankruptcy opinion does nothing to resolve whether . . . courts would be required to abide by it, . . . the opinion ha[s] no legal effect and is merely advisory."  *Bath Iron Works Corp. v. Congoleum Corp. (In re Congoleum Corp.)*, Adv. Pro. No. 20-10439, 2021 WL 28396 (Bankr. D.N.J. Jan. 4, 2021) (quoting *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 422 (3d Cir. 2013)).

44.      The United States Bankruptcy Court for the District of New Jersey's ruling in *Congoleum Corp.* is particularly instructive.  There, as part of a settlement under Bankruptcy Rule 9019, the parties were requesting the court to "resolve the disputed issue upon an agreed factual record" in an action pending in a separate district court.  2021 WL 28396 at *3.  The court found that its ruling "would have no effect on the parties' litigation positions in the [adversary proceeding at issue] apart from possibly revealing th[e] [c]ourt's thought process on the parties' respective positions."  *Id.*  Since the court was "disinclined to tip the scales in favor of any party to pending litigation by issuing" even partial findings, Judge Kaplan denied the settlement motion outright.

45.    The Court should do the same here.  To be entered, the Proposed Settlement Order requires this Court to issue findings on whether (i) the Black Elk Funds are property of the Debtor's estate and (ii) the Black Elk Injunction remains effective as to those assets.  Neither of those issues have been appropriately teed up for this Court's determination through a motion under Bankruptcy Rule 9019 and instead require, at the very least, an adversary proceeding.  *See* Bankruptcy Rule 7001(2), (9) (requiring an adversary proceeding in connection with property of the estate and any declaratory relief related thereto); *see also* Final DIP Hearing Trial Tr. Oct. 25, 2021 21:7-14 ("[T]here are lots of different ways of teeing up that question.  It can be through an adversary proceeding seeking declaratory judgment.  I think either side, I think, without prejudice to anyone's right to tell me that I'm wrong about procedure, but I would think either party could seek a declaration by way of adversary with respect to whether [the Black Elk Funds] are or are not property of the estate.").  Since the Proposed Settlement Order would have neither a binding effect (with the Black Elk Injunction in place) nor resolve the issues surrounding property of the estate, this Court should deny approval thereof as an inappropriate advisory opinion.  *Congoleum*, 2021 WL 28396, at *4; *see also In re Cubic Energy, Inc.*, 587 B.R. 849, 857 (D. Del. 2018) (declining to "review [a motion] on the merits [that] would not have a judicial effect on the outcome of future proceedings, leading [that court] to the conclusion that declaratory relief [was] not appropriate" as an advisory opinion).

**C.    The Debtor Has Failed to Satisfy its Burden that the Settlement is Fair and Equitable and Satisfy the *Martin* Factors.**

46.    The decision whether to approve a settlement is committed to the sound discretion of the bankruptcy court.  *See, e.g.*, *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008).  In exercising such discretion, a bankruptcy court must carefully examine the proposed settlement to determine whether its terms are "fair and equitable."  *Will v. Nw. Univ. (In re Nutraquest, Inc.)*,

434 F.3d 639, 644 (3d Cir. 2006).    When evaluating whether to approve a settlement, a bankruptcy court must consider how the settlement affects not only the parties to the settlement, but also the non-settling creditors.  *Id.* at 645 ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.* the parties who did not settle.").    "While creditors' objections are not controlling, emphasis is placed on the paramount interests of creditors and proper deference given to reasonable views set forth in their objections."  *In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005).

47.    In evaluating the settlement, the bankruptcy court must be able to reach the ultimate, independent conclusion that the settlement is fair and equitable.  As courts have observed, "[t]o tolerate less would make the Court into a rubber stamp, allowing the [debtor's] evaluation to be determinative.  The cases, however, call upon the Court to make the ultimate judgment."  *See In re Hyloft, Inc.*, 451 B.R. 104, 110 (Bankr. D. Nev. 2011) (quoting *In re Olson*, No. 04-01210-TLM, 2006 WL 2433448, at *2 n.8 (Bankr. D. Idaho 2006)).

48.    The debtor bears the burden of proving that any settlement is "fair and equitable" and in the best interests of the estate.  *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009 WL 1531788, at *4 (Bankr. D. Del. June 2, 2009).  The debtor must demonstrate that it made an "informed judgment after diligent investigation."  *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992).  Absent "sufficient factual foundation" establishing that the settlement is fair and equitable, the Court cannot approve it.  *See In re A & C Props.*, 784 F.2d 1377, 1383 (9th Cir. 1986) ("An approval of a compromise, absent a sufficient factual foundation which establishes that it is fair and equitable, constitutes an abuse of discretion.").  Furthermore, deference to a debtor's business judgment is limited because a debtor still bears the burden of persuading the bankruptcy court that the settlement is fair and equitable and ought to

be approved.  *Spansion*, 2009 WL 1531788, at *4 ("While a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.").

49.     To aid in evaluating whether a settlement is fair and equitable, courts in the Third Circuit apply the four criteria set out in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (the *Martin* factors) when analyzing a proposed settlement: (1) probability of success in litigation; (2) likely difficulties in collection; (3) complexity of litigation involved, and expense, inconvenience and delay necessarily attending it; and (4) paramount interest of creditors.  A debtor advancing a settlement "must present a cogent and detailed factual explanation, discussing how the [*Martin*] factors apply to the specific litigation and proposed settlement." *See Hyloft*, 451 B.R. at 110.

50.     Here, the "fair and equitable" requirement and the *Martin* factors apply to the Settlement Agreement because it seeks a purported "resolution of all outstanding issues between them relating to the High Island Project."  Settlement Motion ¶ 9.  Therefore, the Debtor bears the burden of showing that the *Martin* factors support the settlement, that it made an informed judgment to enter into the settlement after diligent investigation, and that the settlement is otherwise fair and equitable and in the interests of the estates and creditors.  The Debtor fails to meet its burden.

51.     The Debtor fails the first factor (probability of success in litigation) because it fails to mention or even acknowledge the existence of the main dispute undergirding the Settlement Agreement:  the EDLA Proceeding.  There, TOPS and the Debtor (among other defendants) are litigating over the ownership of the Black Elk Funds, which the Debtor seeks to

disperse under the terms of the Settlement Agreement. To satisfy its burden under *Martin*, the Debtor must demonstrate its probability of success (if any) in *that* litigation. Indeed, it strains credulity how the Debtor can purport to settle and affect the plaintiffs in the EDLA Proceeding when the plaintiffs are not parties to, and were never invited to discussions regarding, the Settlement Agreement. Instead, the Settlement Motion and Settlement Agreement generally speak of "outstanding issues" among the parties to the settlement without providing any specifics as to the parameters of those disputes or the Debtor's probability of success as to such disputes if they proceeded to litigation. This lean evidentiary showing does not hold water under *Martin*.

52.     Also, the Settlement Agreement does not resolve all disputes among the parties despite the Debtor's representations. Settlement Motion ¶ 15. The Debtor admits that it does not resolve all issues with the Black Elk Trustee as the Debtor's proof of claim in the Black Elk Proceeding remains outstanding (D.I. 149 ¶ 15) and it fails to mention that the Debtor recently agreed with the Black Elk Trustee to extend his deadline to file a proof of claim to March 7, 2022. *See* D.I. 146. W&T, another party to the Settlement Agreement, also filed a proof of claim against the Debtor in an unliquidated amount. *See* Proof of Claim 17. As noted above, both the Black Elk Trustee and W&T are Enjoined Parties under the Black Elk Injunction and any action in violation by those parties (or the other Enjoined Parties) will subject them to liability in the EDLA District Court. The Funding Agreement, as incorporated in the Settlement Agreement, "reserves all [parties'] rights, claims and causes of action, including claims related to indemnity and subrogation." Funding Agreement at 4. While the Settlement Agreement purports to release all claims among the Settlement Parties upon entry of the Proposed Settlement Order, it remains to be seen what the Black Elk Trustee and W&T will assert against the estate if they suffer an adverse ruling in the EDLA Proceeding. To satisfy *Martin*, the Debtor

must create a record on these issues and demonstrate the probability of success in resolving those claims.

53.    Second, the Debtor's difficulty in collecting on the Black Elk Funds clearly weighs against approval of the Settlement Agreement.  Nowhere in the Debtor's motion is any mention of the Black Elk Injunction or the Debtor's position on its efficacy or impact.  As stated above, the Black Elk Injunction remains binding on the Enjoined Parties and prohibits them from making any payments under the proposed Settlement Agreement.  Because it is legally impossible for the Debtor to collect the payments contemplated under the Settlement Agreement, it cannot be approved.

54.    Third, the Debtor's analysis of the complexities of litigation is non-existent and fails to identify any facts or analysis of the pending disputes with the Settlement Parties that the Settlement Agreement purports to resolve.  For that reason alone, this factor weighs strongly against settlement.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 440–41 (1968) (finding settlement approval improper where record is "devoid of facts which would have permitted a reasoned judgment that the claims . . .  should be settled in this fashion," and provided inadequate basis for court to "form an educated estimate of the complexity, expense and likely duration of [the] litigation"); *Spansion*, 2009 WL 1531788, at *8 (same).  Here, the Debtor mentions there are "open issues" among the Settlement Parties, yet fails to identify them or how the Settlement Agreement actually resolves them.  Settlement Motion ¶¶ 10, 15.  As noted above, the Black Elk Trustee and W&T have pending proofs of claim against the Debtor, and it is presently unknown what impact those claims will have against the estate if the Debtor is to indemnify the Black Elk Trustee and W&T for any liability they incur for violating the Black Elk Injunction.

55.    Separately, the Debtor is "resolving" the general unsecured claim of TPW by paying it in full.  The Debtor puts forth no evidence as to its analysis and investigation into whether this claim should be paid in full or, alternatively, the complexities and costs to litigate it. Since the Reefing Fee materially reduces the amount of Black Elk Funds under the Settlement Agreement, the Debtor must provide evidence on the need to pay it and why doing so is a better use of estate resources than opposing or seeking to reduce the Reefing Fee.

56.    Fourth, the paramount interest of creditors requires that the Settlement Agreement be rejected.  The Settlement Agreement provides no benefit to the Debtor's estate and creditors because $3.7 million (plus the Carve-Out (as defined in the Final DIP Order)) of the Black Elk Funds, if collectible by the Debtor, will go to repayment of the DIP Facility when no liens or claims under the Final DIP Order are attached to those assets.  *See* Settlement Motion ¶ 9 ("In accordance with the Final DIP Order, the Debtor intends to distribute the proceeds of the High Island Receivable . . . to repay the DIP Facility."); Final DIP Order ¶ 36.  This result was the main concern of TOPS and OTS when they objected to the DIP Motion, and which this Court recognized and acknowledged when reserving all of the parties' respective rights as to the Black Elk Funds and the purported High Island Receivable.  *See* Final DIP Order ¶ 32; *See* Oct. 25, 2021 Trial Tr. 46:11-14 ("I understand your position, and I don't believe that either party ought to, in connection with this loan, get some strategic benefit with regard to that dispute.").  The Debtor now seeks the same result through the Settlement Agreement without making any effort to resolve the pending dispute in the EDLA District Court or filing the necessary adversary complaint to determine whether the Black Elk Funds are indeed property of the Debtor's estate.[19]

---

[19]    While the Debtor makes no effort to resolve the pending dispute, TOPS and OTS respectfully request relief from the automatic stay to proceed with the EDLA Proceeding, as discussed in the Cross-Motion.

Bankruptcy Rule 7001(2); *See* Final DIP Hearing Trial Tr. Oct. 25, 2021 21:7-14 (opining that an adversary proceeding was an appropriate vehicle to settle the property-of-the-estate dispute). Considering that material disputes remain pending regarding ownership and disposition of the Black Elk Funds, the Debtor has put forth no justification for the Black Elk Funds to pay down all let alone any portion of the DIP Facility under the Settlement Agreement necessitating its denial.

57.    The Objecting Creditors further question what, if any funds, will be available for the estate if it closes the Settlement Agreement.  By the Debtor's own admission, only $5.6 million is recoverable under the Funding Agreement.  Settlement Motion ¶ 9.  The Settlement Agreement proposes to pay the Reefing Fee to TPW in full—in an amount equal to TPW's scheduled, unliquidated, disputed claim—$878,243.  *Compare* Settlement Agreement at 3 *with* Schedules at 15, Item 3.25.  This results in potentially recoverable funds in the amount of $4.7 million, not the purported $5.2 million represented in the Settlement Motion.  Settlement Motion ¶ 9.  From this $4.7 million, the Debtor intends to pay at least $3.7 million (plus interest, fees, etc.) to satisfy the DIP Facility, leaving at most $1 million in potentially available funds.  From there, the pending fee applications will swallow what remains of that value.  Specifically, based on the fee applications filed to date, there exist approximately $601,734.90 in accrued fees and expenses charged against the estate.  *See* D.I. 115, 116, 136, 147, 157, 158.  Thus, if no further fee applications are filed, the estate will be left with at most approximately $400,000.  Yet, more fee applications are expected:  lead and local counsel to the Committee have only requested amounts through December 2021 and Debtor's counsel have only requested amounts through October 2021.  Traverse, the Debtor's CRO, have yet to file a single monthly staffing report

(dating back to September 2021).  As such, the Settlement Agreement cannot be viewed as fair and equitable to the estate when it is essentially left with nothing.

58.     In addition, the Settlement Agreement pays off claims in full with no justification while saddling the estate with potential liability in the future, all to the detriment of the Debtor's creditors.  As noted above, the general unsecured claim of TPW is being paid in full under the Settlement Agreement, yet the Debtor provides no support for why it needs to be paid or any efforts to reduce the payment.  The Debtor's creditors deserve justification for why this general unsecured creditor is given preference over others.

59.     Further, the Black Elk Trustee and W&T may assert additional indemnification claims against the estate through their pending proofs of claim if they are found liable for violating the Black Elk Injunction.  Since nothing in the Settlement Agreement purports to release these claims, the Settlement Agreement must also be denied on this basis.

60.     For all the foregoing reasons, the Settlement Agreement is not fair and equitable and should be rejected.

## CROSS-MOTION FOR RELIEF FROM STAY

## JURISDICTION

61.     The United States District Court for the District of Delaware has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the District Court, dated February 29, 2012.  *See Healthcare Real Estate Partners, LLC v. Summit Healthcare Reit, Inc. (In re Healthcare Partners, LLC)*, Adv. Pro. No. 16-50981 (CTG), 2022 WL 348176, at *9 n.65 (Bankr. D. Del. Feb. 4, 2022).

62.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 362(d)(1) of the Bankruptcy Code.

## RELIEF REQUESTED

63.     By this Cross-Motion, pursuant to section 362(d)(1) of the Bankruptcy Code and Bankruptcy Rules 4001(a) and 9014, TOPS and OTS respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting relief from the automatic stay to allow TOPS and OTS to proceed with the EDLA Proceeding pending before the EDLA District Court to allow a final resolution as to the ownership of the Black Elk Funds.

## BASIS FOR RELIEF REQUESTED

64.     It is well established that, although broad, the automatic stay is not absolute, and, in appropriate instances, relief from the stay should be granted.  *Wedgewood Inv. Fund, Ltd. V. Wedgewood Realty Group, Ltd. (In re Wedgewood)*, 878 F.2d 693, 697 (3d Cir. 1989); *In re ABC Learning Centres Ltd*., 445 B.R. 318 (Bankr. D. Del. 2010).

65.     Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause[.]"  "Cause" in this context is a flexible concept, and depends on the totality of the circumstances in each particular case.  *See, e.g.*, *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997) (reversing denial of motion for relief from stay in order to allow appeal to proceed in state court); *In re SCO Grp., Inc*., 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citation omitted).

-27-

66.    Courts in this and other districts have found cause for relief from the stay to permit pending litigation against a debtor to continue in a non-bankruptcy forum. *See, e.g.*, *In re ABC Learning Centers*, 445 B.R. at 318 (granting stay relief to permit prosecution of litigation against debtor in a non-bankruptcy forum); *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (same); *In re Pursuit Athletic Footwear*, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996) (same); *Baldino*, 116 F.3d at 89-91 (same); *SCO Grp.*, 395 B.R. at 857-60 (same).

67.    To determine whether sufficient "cause" exists to modify the automatic stay, this Court generally applies the following three-pronged balancing test:

> (i) Whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit;
> (ii) Whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor;
> (iii) Whether the creditor has a probability of prevailing on the merits.

*In re Scarborough St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)); *see also In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993) (internal citation omitted) (same).

68.    Each of these three factors weigh in support of lifting the automatic stay. *First*, the Debtor will not suffer great prejudice, let alone any prejudice, if the stay is modified for the EDLA Proceeding to continue in the EDLA District Court. As has been discussed and recognized by this Court, it has yet to be determined whether the Black Elk Funds are property of the estate under section 541 of the Bankruptcy Code and all parties' rights have been preserved with respect thereto under the Final DIP Order. Final DIP Order ¶ 32. This issue must be decided before this case can proceed. There is no court better suited to make a final

determination on this issue than the EDLA District Court, as all issues have been fully briefed and the EDLA District Court has already made a preliminary determination. *Scarborough*, 535 B.R at 68 (finding non-bankruptcy forum was already in "position to make [a] determination [key to the debtor's interest in property] and has familiarity with the parties and the facts of the case as evidenced by the previous orders it has entered"); *see also In re Continental Airlines, Inc.*, 152 B.R. at 424-25 (finding minimal prejudice to debtor from lifting of automatic stay where debtor "will be required to address this issue . . . whether the stay is lifted or not" and stating that "[t]he difference between filing briefs and preparing for oral argument in [one forum] as opposed to [another] is negligible in terms of added litigation expenses and diverted attention."). In contrast, the Debtor has not yet filed an adversary proceeding or other action to ripen the issue for this Court despite having months to do so, and the benefit of the view of this Court that an adversary proceeding was likely required. To do so now would only add unnecessary administrative expenses and delay to this case that only harms the Debtor and its creditors.

69.     With respect to the second factor, the balancing of harms to the parties, it is clear from the facts that TOPS and OTS will suffer greater harm if the stay is not lifted. As noted in connection with the first prong, whether the Black Elk Funds are property of the estate must be decided as a threshold issue. This Court has previously found that where a necessary issue is already ripe in another forum the prejudice suffered by the non-debtor party outweighs that of the debtor. *Scarborough*, 535 B.R. at 69.

70.     Moreover, obtaining a final disposition on this necessary issue in another forum will have minimal or no financial impact on the Debtor or the estate. Indeed, there is no evidence or even suggestion that litigating issues in the EDLA District Court where they are

already developed would cost the Debtor more or be more burdensome than doing so before this Court. This is not a mass-tort bankruptcy where the Debtor has numerous actions pending in multiple forums simultaneously. Instead, there is one pending action in one alternative forum where litigation has progressed materially, and it only makes sense to proceed there. Also, High Island is not the Debtor's only potential source of revenue; the Debtor has stated that the Breton Sound funds will be available for the estate in the near term. *See* First Day Declaration ¶ 16 ("The Breton Sound Project is largely complete save for the removal of a concrete barge" and the Debtor "expects to receive approximately $4,400,000 on account of the Breton Sound receivable upon completion"). The receipt of the Breton Sound receivable should facilitate the Debtor's participation in the EDLA Proceeding and allow the issues regarding the Black Elk Funds to be finally determined with minimal impact to this bankruptcy case.

71. The final factor also weighs heavily in TOPS's and OTS's favor. "Even a slight probability of success on the merits may be sufficient to support lifting the automatic stay in an appropriate case." *In re Tribune Co.*, 418 B.R. at 129 (quoting *Continental*, 152 B.R. at 426). This Court need not speculate as to whether TOPS and OTS have a likelihood of success on the merits of their claims because the EDLA District Court has already made such a finding. *See* Black Elk Injunction at 33 (finding a likelihood of success on the merits against JAB). This finding from a sister court is sufficient for the Court's finding here. *See, e.g.*, *Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 719 (Bankr. D. Del. 1996) (decision by court in other forum denying debtor's motion for preliminary injunction sufficient to establish likelihood of success on merits); *Scarborough*, 535 B.R. at 69-70 (arbitration award adverse to debtor sufficient to establish likelihood of success on merits).

72.     Finally, the policies underlying the automatic stay bolster the need to lift the automatic stay and proceed in the EDLA District Court.  Here, in "filing its bankruptcy case, [the Debtor] is not seeking 'breathing room' from its litigation; it is continuing litigation." *Scarborough*, 535 B.R. at 70.  Specifically, the Debtor is using this forum as a means to achieve a favorable ruling determining the ownership of the Black Elk Funds because it has already suffered an adverse ruling in the EDLA District Court.  The Debtor believes with the stay in place, it is free to act in violation of the Black Elk Injunction and drive the Black Elk Funds into the hands of its secured lenders.  However, the automatic stay was intended to be a "shield," not a "sword,"[20] and therefore the stay should be modified so that this behavior is not condoned.  *See Scarborough*, 535 B.R. at 70 (granting stay relief due to, among other reasons, the "Debtor [] using its bankruptcy case as a 'sword' and not a 'shield'").

73.     For all the foregoing reasons, the stay should be modified for the EDLA Proceeding to continue in the EDLA District Court.

## **RESERVATION OF RIGHTS**

74.     TOPS and OTS reserve and preserve all of their respective rights to supplement or amend this Objection and Cross-Motion.  TOPS and OTS also reserve all of their respective rights with respect to any filing by the Debtor or parties in support of the Settlement Motion

---

[20]     Indeed, TOPS and OTS submit that the timing of this bankruptcy case was for the express purpose of tolling the Debtor's time to move to modify or vacate the Black Elk Injunction.  The proper procedural vehicle to "modify" an order granting a preliminary injunction is a motion to alter or amend a judgment under Federal Rule 59(e).  *American ORT, Inc. v. Israel*, No. 07 Civ. 2332, 2009 WL 233950, at *2 n.2 (S.D.N.Y. Jan. 22, 2009) ("Because a grant of a preliminary injunction is an interlocutory order from which an appeal lies . . . a motion pursuant to Rule 59(e) to modify a preliminary injunction order is procedurally proper."); *Centennial Broadcasting, LLC v. Burns*, 433 F. Supp.2d 730, 733 (W.D. Va. 2006) (noting a motion under Federal Rule 59(e) was appropriate procedure for modifying preliminary injunction).  Under the Federal Rules, the Debtor had 28 days to file a motion under Federal Rule 59(e) from the entry of the preliminary injunction.  Fed. R. Civ. P. 59(e).  Since the preliminary injunction was entered on August 10, 2021, the Debtor's deadline to such a motion was September 7, 2021, i.e. the Petition Date.

prior to the hearing on the Settlement Motion.  Nothing contained in, or omitted from, this Objection and Cross-Motion constitutes an admission or stipulation by TOPS or OTS with respect to any alleged claims against the Debtor, the Enjoined Parties or the DIP Lender, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtor or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtor's assets.

### **REQUEST FOR WAIVER OF BANKRUPTCY RULE 4001(A)(3)**

75.    TOPS and OTS respectfully request relief from the 14-day stay contemplated by Bankruptcy Rule 4001(a)(3) and request that the order granting this Cross-Motion become effective immediately upon entry to enable TOPS and OTS to immediately reopen the EDLA Proceeding.


### **NOTICE**

76.    A copy of this Cross-Motion has been provided to the following parties:  (i) counsel to the Debtor; (ii) counsel to the official committee of unsecured creditors; (iii) the Office of the United States Trustee for the District of Delaware; (iv) all parties requesting notice under Bankruptcy Rule 2002; and (v) all known parties having an interest in the subject property or relief requested.  TOPS and OTS submit that, in light of the nature of the relief requested, no other further notice need be given.

## <u>CONCLUSION</u>

77.    For the foregoing reasons, TOPS and OTS respectfully requests that the Court (i) deny approval of the Settlement Motion and (ii) enter the Proposed Order, attached hereto as **<u>Exhibit A</u>**, approving the Cross-Motion.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 17, 2022
        Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Joseph C. Barsalona II*
Matthew B. Harvey (No. 5186)
Joseph C. Barsalona II (No. 6102)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:  mharvey@morrisnichols.com
       jbarsalona@morrisnichols.com

*Counsel to Turnkey Offshore Project Services, LLC and Offshore Technical Solutions, LLC*

– and –

**NALLEY, DEW, AND MINER, APLC**
A Professional Law Corporation
George J. Nalley, Jr. (admitted *Pro Hac Vice*)
2450 Severn Avenue
Metairie, LA 70001
Telephone: (504) 838-8188
Email: george@gnalley.com

– and –

**RICHARD W. MARTINEZ, APLC**
Richard W. Martinez (admitted *Pro Hac Vice*)
3500 N. Hullen St.
Metairie, LA 70002
Telephone: (504) 525-3343
Email: richard@rwmaplc.com

*Counsel to Turnkey Offshore Project Services, LLC*

– and –

**BOHMAN MORSE, LLC**
Martin S. Bohman (admitted *Pro Hac Vice*)
400 Poydras Street, Suite 2050
New Orleans, LA 70130
Telephone: (504) 930-4009
Facsimile: (888) 757-6899
Email: martin@bohmanmorse.com

*Counsel for Offshore Technical Solutions, LLC*