# **EXHIBIT K**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TURNKEY OFFSHORE PROJECT | * | NO: |
| SERVICES, LLC ("TOPS") | * | |
| | * | JUDGE |
| VERSUS | * | |
| | * | |
| JAB ENERGY SOLUTIONS, LLC | * | MAGISTRATE |
| and BRENT BOUDREAUX, | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes Turnkey Offshore Project Services, LLC ("TOPS") and files this Complaint against JAB Energy Solutions, LLC and Brent Boudreaux, as more fully set forth herein.

I.

This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333(1) , and within the meaning of the Federal Rules of Civil Procedure 9(h), as this cause of action arises out of a breach of a maritime contract for the removal of offshore platforms in the Gulf of Mexico.

II.

The Court has jurisdiction over this matter under 28 U.S.C. § 1333 because the claims herein involve the interpretation and application of a maritime contract.

III.

TOPS was and continues to be a limited liability company organized and existing under the laws of the State of Louisiana and authorized to do business in the State of Louisiana. TOPS' principal place of business is located in Dulac, Louisiana, which is in the jurisdiction of this Court.

1

IV.

Named as Defendants in this matter are:

a) JAB Energy Solutions II, LLC (hereinafter "JAB II"), a foreign limited liability company organized under the laws of the State of Delaware, with its principal place of business in Shenandoah, Texas. At all times pertinent to this claim, JAB Energy Solutions II, LLC was authorized to and doing business with TOPS in Dulac, Louisiana.

b) Brent Boudreaux, who, based on information and belief, is believed to be a resident of the State of Texas, but who regularly did business with TOPS in Louisiana.

V.

JAB II and/or Brent Boudreaux are liable to TOPS for the full sum of $8,297,633.82, plus interest from the date the money became due, until paid, plus reasonable attorneys' fees and all costs of these proceedings.

VI.

On or around June 18, 2018, Brent Boudreaux and JAB II approached TOPS about and entered into a Master Service Agreement (MSA) to govern work performed by TOPS for JAB II from time to time. A copy of the MSA is attached hereto as Exhibit "A."

VII.

At the request of Brent Boudreaux, TOPS submitted a bid letter to JAB and Brent Boudreaux on September 24, 2020, for the proposed removal of the HI 370A platform removal (the "work"). (A copy of this bid letter is attached hereto as Exhibit "B").

VIII.

The bid letter, which was submitted by TOPS to JAB and Brent Boudreaux, specified the day rate cost that would be charged for work performed this late in the season, as well as the terms for payment for down time due to weather. (See Exhibit B).

2

IX.

On or around September 25, 2020, TOPS and JAB II entered into a Work Order for the salvage and removal of an offshore Platform located on the Outer Continental Shelf, designated HI A 370 A. (A copy of this signed Work Order is attached hereto as Exhibit "C").

X.

The Work Order memorialized the agreed to rate of pay for the work performed by TOPS to remove the HI A 370 A platform. (See Exhibit C).

XI.

The work was anticipated to begin on October 6, 2020.

XII.

During the course of the work, several tropical storms and hurricanes caused delay and weather related down time.

XIII.

Despite these weather delays, the work was completed by TOPS on December 8, 2020. The Job Completion Certificate is attached hereto as Exhibit "D."

XIV.

JAB II, however, has refused to pay TOPS for the vast majority of the work.

XV.

Given the fact that the parties were fully aware that the job was subject to significant weather delays, since it was being requested and preformed so late in the season, this job was performed on a time plus material costs basis (see work order, exhibit B). The agreed to daily rate plus the cost rates that apply, also apply to down time due to inclement weather or tropical storms, with a 10% reduction for non-productive time.

XVI.

Pursuant to the MSA, TOPS was to issue JAB II invoices for work performed, which TOPS did.

XVII.

By the time the job was completed, TOPS had incurred $9,529,001.32 in billed time. After credits of $388,723.75 for scrap iron, release of labor and other adjustments, TOPS invoiced JAB II for $9,140,277.57 between November 16, 2020 and February 12, 2021.

XVIII.

Invoices were sent to JAB II between November 16, 2020 and February 12, 2021. Copies of those invoices are attached hereto as Exhibit "E. A spreadsheet itemizing the charges, credits and payments made for the work is attached hereto as Exhibit "F."

XIX.

Pursuant to the MSA entered into between TOPS and JAB II, all payments on invoices are due within forty-five (45) days after JAB II receives an invoice, unless notice of any disputes is timely made. See Exhibit A. According to the work order, all undisputed amounts shall be paid within 60-days of receipt of the invoices by JAB II.

XX.

TOPS did not receive any notice from JAB II of any dispute as to any amount invoiced for the work.

XXI.

JAB II paid the first two invoices, numbers 1551 and 1552, in full, and made a partial payment on the third invoice, number 1553, which was issued on November 19, 2020, for a total payment of $619,970.

XXII.

Brent Boudreaux negotiated the work for JAB with TOPS. During the course of the job, Brent Boudreaux was the contact person for JAB, who interacted with TOPS.

XXIII.

At no time during the negotiations for the job did Brent Boudreaux ever disclose to TOPS that JAB had limited funds for this work. To the contrary, Brent Boudreaux affirmatively represented that JAB was capable of and wanted to contract the work on a time and material basis, as the work had to be completed that Fall.

XXIV.

In mid-November 2020 after the work was more than half-way completed, Brent Boudreaux disclosed to TOPS for the first time that JAB had limited resources to pay for the work, the amount of which had already been exceeded by the work then completed by TOPS. Boudreaux also disclosed at the same time that JAB would not get paid at all, and thus TOPS as well, until the job was fully completed, as JAB's contract with the Bankruptcy Court required completion of the job entirely before JAB would be paid at all.

XXV.

Accordingly, Brent Boudreaux advised TOPS that it would have to complete the job entirely if they wanted to be paid anything, including for the over $5.4 million of work TOPS had already completed before Boudreaux made this disclosure.

XXVI.

Brent Boudreaux intentionally failed to disclose and in fact misrepresented the financial situation and solvency of JAB to be able to pay for this job at the time he negotiated the contract with TOPS and during the course of the job until the disclosure in mid-November. Brent Boudreaux intentionally misled TOPS during the course of the work as to the financial

5

wherewithal of JAB to pay for the work he had contracted with TOPS to perform, and then forced TOPS to complete the job if it wanted to be paid for its work, both that was already completed and to be completed.

### XXVII.

Brent Boudreaux's intentional misrepresentation of the ability and intent of him and JAB to pay for the work he was requesting was fraudulent and purposeful, thereby subjecting him personally for liability for the damages inflicted on TOPS by his intentional misrepresentations both during the negotiations and during the course of work performed by TOPS.

### XXVIII.

By December, it became clear that JAB II was not going to continue to pay for the work as agreed, so a demand was sent to JAB II to work with TOPS on a payment schedule. (See Exhibit "G").

### XXIX.

Formal demand for at least partial payment was made again by TOPS on March 2, 2021. (See Exhibit "H").

### XXX.

To date, no response to these communications has been received by TOPS from JAB II or Brent Boudreaux and only $619,970 has been paid of the total $9,140,277.57 invoiced. Accordingly, $8,297,633.82 remains outstanding.

### XXXI.

Citation and service of this Petition serves as additional written demand for the payment of the amount owed.

XXXII.

JAB II has breached its contract with TOPS by failing to pay TOPS for the amount it is owed.

XXXIII.

In the alternative, TOPS is entitled to damages under the law of unjust enrichment. JAB II has been unjustly enriched by the receipt of TOPS equipment, personnel and services, and TOPS has been impoverished by JAB II's failure and refusal to make a payment. Accordingly, JAB II is liable to TOPS for the value of the unjust enrichment.

XXXIV.

Brent Boudreaux purposefully and intentionally misled TOPS as to the financial wherewithal of JAB II, so as to fraudulently induce TOPS to undertake this work for him and JAB II.

XXXV.

The MSA provides that in the event of any litigation relating to the agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs of litigation from the other party. See Exhibit A.

WHEREFORE, Turnkey Offshore Project Services, LLC prays that Brent Boudreaux and JAB II be duly cited and served with this Complaint and that, after all due proceedings are had, there be a judgement rendered in its favor and against JAB Energy Solutions II, LLC and Brent Boudreaux, in the amount of $8,297,633.82, plus interest, reasonable attorney's fees, and all costs of this litigation, as well as any other and further relief to which TOPS is entitled.

7

Respectfully submitted,

NALLEY AND DEW
A Professional Law Corporation

_____
GEORGE J. NALLEY, JR.                    (9883)
ANDREW J. MINER                          (34682)
Suite 100
2450 Severn Avenue
Metairie, LA  70001
(504) 838-8188
andrew@gnalley.com
george@gnalley.com
Attorneys for Turnkey Offshore Project
Services, LLC

## MASTER SERVICE AGREEMENT

### THIS AGREEMENT CONTAINS PROVISIONS RELATING TO
### INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK.

**1.   PARTIES**

    This Master Service Agreement ("Agreement") is made and entered into this ___18th___ day of June, 2018 (the "Effective Date"), by and between Turnkey Offshore Project Services, LLC (hereinafter "TOPS" or "Contractor") and JAB Energy Solutions II LLC ( hereinafgter "JAB" or "Company"). Contractor and Company may be referred to herein individually as "Party" and collectively as "Parties".

**2.   PURPOSE AND SCOPE**

    2.1   **Master Agreement**- This Agreement is a master agreement between Company and Contractor. For and in consideration of the covenants and provisions contained herein, this Agreement shall control and govern all services performed by Contractor for Company, and Contractor's provision to Company of products, equipment, supplies or materials utilized in connection with such services (collectively "Work"). During the term of this Agreement Contractor agrees to furnish all labor, equipment, and materials and all other things necessary to perform the Work, more fully described on Exhibit "A", which may be requested by Company.

    2.2   **Non-Exclusive Agreement** - The Parties understand that this is a non-exclusive agreement and that Company may contract with other contractors to supply the same type or similar services as those offered by Contractor; and Contractor may perform the same type or similar services for others. This Agreement does not bind Company to request work, or Contractor to agree to perform work if requested.   **HOWEVER, WHENEVER CONTRACTOR PERFORMS ANY WORK FOR COMPANY, THIS AGREEMENT SHALL GOVERN ALL SUCH WORK, UNLESS AUTHORIZED OFFICERS OF THE PARTIES, AFTER REFERENCING THIS AGREEMENT, SPECIFICALLY AGREE OTHERWISE IN WRITING.**

    2.3   **Prior Agreement(s)** - This Agreement shall terminate and replace any similar agreement entered into heretofore by and between the Parties.

**3.   DEFINITIONS**

    (a)   **"Claim" or "Claims"** means, unless specifically provided otherwise, all claims (including, but not limited to, those for property damage, personal injury, illness and death), damages, liabilities, losses, demands, liens, encumbrances, fines, penalties, causes of action of any kind (including actions in rem or in personam), obligations, costs, judgments, interest and awards (including payment of attorneys' fees and costs of litigation) or amounts, of any kind or character, whether under judicial or administrative proceedings or otherwise, or conditions in the premises of or attributable to any person or persons or any party or parties, breach of representation or warranty (express or implied), under any theory of tort,

1

Exhibit A

contract, breach of contract, arising out of, or incident to or in connection with this Agreement or the performance of the Work under this Agreement, including but not limited to those which arise out of or are directly or indirectly connected with vessels and/or the ownership, possession, management, manning, maintenance, supply, operation (including but not limited to ingress, egress, loading and unloading operations) or navigation of any vessel.

(b)     **"Company Group"** means Company, its parent, subsidiaries, related and affiliated companies, and any party from whom Company is performing services of which the Work forms a part, its and their other contractors (other than members of Contractor Group), and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers, subrogees and invitees of all of the foregoing.

(c)     **"Contractor Group"** means Contractor, its parent, subsidiaries, related and affiliated companies, and its and their subcontractors, and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers, subrogees and invitees of all of the foregoing.

(d)     **"Third Party"** or **"Third Parties"** means a person or entity other than members of Company Group and Contractor Group.

(e)     The term **"REGARDLESS OF FAULT"** means **WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS, OR OTHERWISE), STRICT LIABILITY, OR OTHER FAULT (BUT SPECIFICALLY EXCLUDING THE WILLFUL MISCONDUCT OF ANY INDEMNIFIED PARTY) OF ANY MEMBER OF COMPANY GROUP, CONTRACTOR GROUP AND/OR THIRD PARTIES, AND WHETHER OR NOT CAUSED BY A PRE-EXISTING CONDITION OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT OF A PARTY WHETHER CHARTERED, OWNED, OR PROVIDED BY COMPANY GROUP OR CONTRACTOR GROUP.**

(f)     **"Work Site"** means any location(s) at which Contractor performs any part of the Work.

(g)     The phrases **"arising out of, or incident to or in connection with this Agreement or the performance of the Work under this Agreement"** in the definition of "Claims" above and **"arising out of or resulting from the performance of this Agreement"** and similar phrases in this Agreement shall be broadly construed to include not only the Work, but also transportation to and from the Work Site as well as any occurrences at the Work Site, regardless of whether or not the act which causes the Claim is related to the performance of this Agreement.

## 4.     TERM AND TERMINATION

4.1     **Term** - This Agreement shall be effective as of the Effective Date and shall continue in force thereafter until either Party terminates this Agreement for any reason upon

2

Exhibit A

thirty (30) days' advance written notice given to the other Party. Such termination shall not affect any Work in progress at the time of such termination unless Company, in its sole discretion, decides otherwise.

4.2 **Optional Termination of Work Order** - Company may, in its sole discretion, terminate any particular Work Order (as defined in Article 5), at any time, upon written notice. In the event of such termination, Contractor shall be entitled to payment as set out in Article 6 for that part of the Work performed in accordance with this Agreement and the applicable Work Order, together with the reasonable costs as agreed between the parties at the time of termination.

4.3 **Default Termination** - Notwithstanding the foregoing, in the event Contractor, after receiving authorization from Company, fails to commence performing the Work contemplated hereunder in a timely manner, or to diligently prosecute same once commenced, or Contractor breaches any of the material obligations set forth in this Agreement, Contractor shall be considered in default and Company may immediately terminate this Agreement or any Work Order. In the event Company terminates this Agreement or any Work due to Contractor's default, Contractor shall be entitled to payment as set out in Article 6 for only that part of the Work performed in accordance with this Agreement and the applicable Work Order. Any additional costs reasonably incurred by Company as a direct result of such termination shall be recoverable from Contractor.

## 5. WORK COVERED BY THIS AGREEMENT

5.1 **Generally** - All work and/or services requested by Company and accepted by Contractor shall be the subject of an order for Work issued by Company to Contractor (the **"Work Order"**). The Work Order will be either oral or written, and provide, where applicable, a description of the Work to be performed, the consideration to be paid, the job location, equipment, services, supplies, and personnel to be provided by Contractor, and the items, if any, to be furnished by Company. If written, the Work Order may be in a form similar to that shown in Exhibit "A-1", or any other form that is agreed to by the Parties. Nothing in any Work Order, whether written or oral, shall modify or change the terms contained in this Agreement, which shall at all times govern and control; unless the Work Order references the specific provision(s) of this Agreement to be modified and the Work Order is executed by authorized representatives of the Parties; and it is further agreed and understood that any such modification shall be effective only with respect to that particular Work Order and no other. Although Company may, from time to time, sign Contractor's field tickets, forms for receipt, acknowledgment, documentation, terms of service or similar forms, the terms and conditions associated with such forms (by whatever title) shall not amend, modify, waive, override or release any provision of this Agreement or any Work Order.

5.2 **Vessels** - Company may, from time to time, require that Contractor provide a vessel in order to perform the Work. In such cases, the Contractor agrees any such vessels will be provided subject to the "Special Terms and Conditions for the Provision of Vessels" Exhibit "G" attached hereto and made a part hereof.

## 6. CONSIDERATION AND TERMS OF PAYMENT

6.1. **Consideration** - In consideration of Contractor's performance of Work, Company shall pay to Contractor either:

3

Exhibit A

(a)    An amount determined in accordance with either the rates set forth in the Work Order, or, if not so provided for, the Contractor's Rate Schedule, set forth in Exhibit "B"; or

(b)    A fixed price set forth in the Work Order, which may incorporate, but is not limited to, bid and award documents. Changes to the fixed price shall be made pursuant to Article 10; or

(c)    An amount agreed to in the Work Order that may include a discount to the Rate Schedule for specific periods or particular Work.

Contractor hereby agrees that all the terms and conditions of this Agreement shall remain in full force and effect (except the Rate Schedule in Exhibit "B") when Contractor performs Work at a fixed price, special or discount rates, which differs from Contractor's Rate Schedule.

**CONTRACTOR SHALL GIVE COMPANY THIRTY (30) DAYS PRIOR WRITTEN NOTICE OF ANY PROPOSED CHANGE IN CONTRACTOR'S RATE SCHEDULE APPLICABLE TO SUBSEQUENT WORK ORDERS. IN NO EVENT SHALL ANY INCREASE IN CONTRACTOR'S RATE SCHEDULE BE EFFECTIVE UNLESS THE CHANGE IS APPROVED IN WRITING BY COMPANY AND THIS AGREEMENT IS PROPERLY AMENDED.**

6.2.    **Terms of Payment** - Company shall pay to Contractor the consideration described in Section 6.1. as follows:

(a)    When Work is authorized and performed in accordance with either Section 6.1(a) or 6.1(c), Contractor shall each day furnish work tickets, on a form acceptable to Company, to Company's Representative (as defined in Section 9.5) for verification of the Agreement number, job location, equipment description, materials or supplies furnished, names of Contractor's employees, and the number of hours worked. All work tickets shall be prepared in strict accordance with the classifications contained in the Contractor's Rate Schedule, Exhibit "B".

Contractor shall render invoices upon completion of the Work, or monthly if the Work lasts longer than a month. Contractor's invoices must be in accordance with this Agreement and have sufficient detail for identification and comparison with Contractor's daily work tickets, this Agreement, and Exhibit "B" or the rates set forth in the applicable Work Order.

(b)    When Work is authorized and performed in accordance with Section 6.1(b), Company will pay for material, equipment, fabrication, and installation in the following manner after Company's approval of invoices covering these items:

Company may, at its option, pay ninety percent (90%) of the invoice amount, in accordance with Section 6.3, after receipt and approval of the invoice. After final acceptance, given by Company in accordance with Article 13, Company will pay the remaining ten percent (10%) of all amounts previously invoiced and approved. Contractor shall not be paid an amount greater than ninety

4

**Exhibit A**

percent (90%) of the total Agreement price while Work is in progress. Invoices shall be submitted as follows:

        (i)    **Major equipment and materials** - Upon Contractor's receipt from vendor.

        (ii)    **Fabrication** - Monthly for that portion considered completed by Company's Representative and Contractor during the invoice period.

        (iii)    **Installation** - Monthly for that portion considered completed by Company's Representative and Contractor during the invoice period.

(c)    After final acceptance of the Work in accordance with Article 13, Company shall pay Contractor all money due, and not previously paid, upon receipt of the following, if requested by Company:

        (i)    Written certification and evidence of Contractor's compliance with all existing laws and/or regulations of all governmental and regulatory bodies with respect to the Work.

        (ii)    Satisfactory evidence of payment of all bills, claims, and obligations for labor, materials, or services incurred in connection with the Work.

        (iii)    Satisfactory evidence that no liens have been filed or recorded against Company, Company's property, or the property subject to this Agreement.

        (iv)    A release by an officer of Contractor, in authentic form, releasing Company, its officers, agents, employees, and persons for whom Company is responsible from all claims of the Contractor arising under this Agreement.

(d)    Payment by Company to Contractor for partial completion of Work shall not be deemed acceptance of such Work or any part thereof, nor shall such payment relieve Contractor of any obligation or waive any of Company's rights.

(e)    All invoices and payments shall be sent to the applicable Party as set forth in Article 18.

6.3.    **Time For Payments** - Unless otherwise provided, payments of undisputed amounts shall be made WITHIN Forty-five (45) DAYS AFTER COMPANY HAS RECEIVED AN INVOICE, in proper form, evidencing that amounts are due. Contractor shall provide, if requested by Company, written verification, supported by proper evidence, that no liens, claims, privileges, or liabilities exist with respect to the Work performed.

5

Exhibit A

6.4  **Disputed Amounts** - In the event of any dispute, Company may, within twenty (20) days after receipt of the invoice, notify Contractor of any item in dispute, specifying the reason therefore, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Alternatively, Company may pay the disputed amount without waiver of any of its rights, including the right to seek reimbursement.

## 7.  **RELATIONSHIP OF THE PARTIES**

7.1  **Independent Contractor** - Contractor certifies that it is, and shall conduct itself as, an independent contractor in the performance of the Work. Contractor shall retain and exercise the authority and right to direct and control the manner in which all Work for Company is performed; provided, however, that Company retains the general right, but is in no way obligated, to observe Contractor in the performance of all Work contemplated hereunder. It is the express understanding and intention of the Parties that Contractor shall act as an independent contractor at all times, that no relationship of master and servant or principal and agent shall exist between Company and Contractor and any of Contractor's employees, agents, representatives or subcontractors. Contractor further certifies that none of the employees, agents or subcontractors of Contractor shall be considered to be or hold themselves out or act as employees of Company. Contractor agrees that neither Contractor nor any of its employees, agents or subcontractors shall act as an agent of Company.

7.2  **Statutory Employer** - In all cases where Contractor's employees (defined to include Contractor's direct, borrowed, special, or statutory employees) are covered by a state's worker's compensation law (such as the Louisiana Worker's Compensation Act, LA R.S. 23:1021 et seq., or similar statute or law of another jurisdiction), Company and Contractor agree that all Work performed by Contractor and its employees pursuant to this Agreement are an integral part of and are essential to the ability of Company to generate Company's goods, products, and services (for purposes of LA R.S. 23:1061 (A)(1) or similar statute or law of another jurisdiction). Furthermore, Company and Contractor agree that Company is the statutory employer of Contractor's employees, pursuant to LA R.S. 23:1061 (A)(3) or similar statute or law of another jurisdiction. Irrespective of Company's status as the statutory employer or special employer, pursuant to LA R.A. 23:1031 (C) or similar statute or law of another jurisdiction, of Contractor's employees, Contractor shall remain primarily responsible for the payment of the worker's compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Company.

## 8.  **OBLIGATIONS OF CONTRACTOR**

8.1  **Contractor-Furnished Items** - Contractor shall furnish, at its own expense, that machinery, equipment, tools, spare parts, transportation, supplies and any other items necessary for the performance and timely completion of the Work (other than such items that Company specifically agrees in the Work Order to furnish). All items to be incorporated into the Work shall be suitable for the Work and new, unless otherwise specified. Company furnished items will be delivered to Contractor at the Work Site or other mutually agreed upon location, and Contractor shall verify the delivery, perform a reasonable visual inspection of such items, and notify Company of shortages or items delivered in a

6

**Exhibit A**

discovered or apparent damaged condition and thereafter protect such items from loss or damage.

8.2 **Personnel** - Contractor shall furnish, at its own expense, any and all personnel, labor, expertise and supervision (skilled in their trades and trained in safety) necessary for the performance and timely completion of the Work.

8.3 **Drawing and Specifications** - Contractor shall perform the Work in accordance with Company's requirements and the drawings and specifications, if any, in the Work Order and any attachments thereto.

8.4 **Commencement and Completion of Work** - If Contractor fails timely to commence the Work consistent with the applicable Work Order, or other agreement, or after such commencement abandons the Work or for any reason suspends or refuses to continue the Work, unless prevented from commencing or continuing the Work by Force Majeure, or by any failure or delay on the part of Company, then Company shall have the right to take over the Work and all materials and supplies furnished by Contractor and complete the Work, or cause the Work to be completed. In that event Contractor shall be paid only: (1) the reasonable compensation for Work actually provided less (2) the difference, if any, between the actual cost required to complete the Work by Company or another contractor and the price initially agreed upon by Company and Contractor for such Work.

8.5 **Permits** - Unless specified to the contrary in the Work Order, Contractor shall obtain and pay for, and cause its subcontractors to obtain and pay for, at its and their cost, all necessary permits, licenses and similar authorizations for Contractor, its subcontractors and their employees that are required to be obtained in their respective names in connection with the performance of the Work. In the event a representative of any governmental body regulating the Work finds any violation upon inspection of the Work or Work Site, which is in any way related to Contractor Group, Contractor shall take corrective action immediately at Contractor's sole cost and expense without limitation of any rights of Company.

8.6 **Familiarity with the Work** - Contractor acknowledges it is generally familiar with, and understands, the nature of the Work, the environment, and the difficulties that may be incident to performing the Work; and, upon arriving at the Work Site, but prior to commencing Work, Contractor will conduct a reasonable inspection of the Work Site.

8.7 **Liens and Encumbrances** - Contractor shall be responsible for paying all costs and charges of all of its subcontractors, vendors and/or any other parties from which Contractor receives goods and/or services in connection with the performance of this Agreement, and agrees to allow no lien, attachment or other encumbrance asserted by any such party to be fixed upon any member of Company Group, Company Group's property, or the property subject to this Agreement. Further, **CONTRACTOR AGREES TO BE RESPONSIBLE FOR, AND HEREBY AGREES TO DEFEND, RELEASE, INDEMNIFY AND HOLD HARMLESS COMPANY GROUP FROM ANY AND ALL CLAIMS ARISING OUT OF ANY WORK PERFORMED BY ANY SUBCONTRACTOR, VENDOR OR ANY OTHER PARTY FROM WHICH CONTRACTOR RECEIVES GOODS OR SERVICES IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT.** In the event any such lien, attachment or other encumbrance is filed as a result of Contractor's failure to pay for labor, materials, services or supplies, upon receipt of written notification thereof, whether

7

**Exhibit A**

from Company or otherwise, without limiting the generality of the foregoing, within thirty (30) days after receipt of such written notice of the existence of such lien, attachment or other encumbrance, Contractor shall remove, by payment or by posting and recording statutory or other bonds satisfactory to Company, any and all liens, attachments or other encumbrances filed or recorded by any subcontractor (or any employee, agent or subcontractor of a subcontractor), vendor or any other party from which Contractor receives goods or services in connection with the performance of this Agreement, which burdens or encumbers any member of the Company Group, Company Group's property, or the property subject to this Agreement. If Contractor shall fail or refuse to take such steps as may be deemed by Company to be necessary to remove any such lien, attachment or encumbrance, Company shall have the right to take any reasonable action to remove such lien, attachment or encumbrance, by posting and recording statutory or other bonds, or by payment, and deducting the cost of such from any money due or to become due to Contractor under this Agreement or any other agreement between the Parties.

Company agrees that it will not pay any such claim or indebtedness as long as it is being actively contested by Contractor and Contractor has taken reasonable actions (including the posting of a bond when appropriate) to protect the property interests of Company and any other party affected by such claim or indebtedness.

8.8     **Taxes** - Contractor shall pay all taxes, licenses and fees levied or assessed on any member of Contractor Group by any governmental agency based upon the wages or salaries paid by any member of Contractor Group to its agents, employees and/or representatives in connection with or incident to the performance of this Agreement, including, but not limited to, unemployment compensation insurance, old age benefits, pensions, social security or any other similar taxes or payments, together with any fines, penalties or liens assessed in connection therewith. Contractor agrees to require the same actions by all members of its Group, and Contractor shall be liable for any breach of these provisions by any members of its Group.

8.9     **Assurances** - At Company's sole discretion, and as a prerequisite to the commencement or continuance of any Work, Contractor may be required by Company to obtain: a Performance and Payment Bond in an amount, and with a surety company, acceptable to Company; an acceptable irrevocable letter of credit in favor of Company; or any other assurance acceptable to Company, at its sole discretion.  Company agrees to reimburse Contractor for the cost of obtaining such assurance.

## 9.     WARRANTIES AND INSPECTION

9.1     **General Services Warranty** – Contractor warrants that any and all services or Work performed by Contractor Group shall be performed in a good and workmanlike manner and in full compliance with Company's requirements and specifications, if any, applicable to said Work. "Workmanlike manner" means services performed in a manner deemed proficient by those with the special knowledge, training, and experience to judge such services. Contractor further warrants that all of the members of Contractor Group will be properly and adequately trained to perform the Work competently and safely, and that Contractor will provide to Company, upon request, documentation to confirm such training and safety programs or history, and any other documentation reasonably requested by Company, including that necessary to comply with any applicable reporting requirements or any governmental agency or any party for whom Company may be providing services. For one (1) year after the Work is completed, or such longer period as may be agreed to by the

8

**Exhibit A**

Parties in the applicable Work Order, Contractor shall re-perform any nonconforming Work at Contractor's sole cost and expense in accordance with the requirements of this Agreement, or at Company's option, refund to Company that portion of the consideration that is attributable to the nonconforming Work. If Company elects to have Contractor re-perform the nonconforming Work, Contractor shall promptly commence and complete such re-performance. If Contractor fails to commence or complete such re-performance to the reasonable satisfaction of Company within a reasonable period of time after Company's request, then Company shall have the right to have the nonconforming Work re-performed by any other contractor (or by Company's own employees), and Contractor shall be responsible for all reasonable costs and expenses incurred as a result of such re-performance.

9.2 **Products Warranty** – Contractor warrants that any and all products, equipment (specifically excluding rental equipment which is addressed below) and materials, including service-related materials, provided by Contractor Group, are free from defects, are in full compliance with the applicable specifications, if any, and that such products, equipment and materials shall comply with all applicable laws, regulations, rules, standards and codes, whether governmental or industry. Contractor will promptly repair or replace at Contractor's sole cost and expense, and to the reasonable satisfaction of Company, any products, equipment or materials that are defective or non-conforming. The products warranty shall be 12 months from the date on which the products, equipment and materials where delivered to Company, or such longer period as may be agreed to by the Parties in the applicable Work Order.

9.3 **Rental Equipment Warranty** – Contractor warrants that all equipment rented to Company shall meet or exceed the applicable equipment specifications upon delivery, be in good working condition throughout the rental period (misuse by Company Group excepted), and, if requested by Company, shall include operating manuals, supplies and spare parts. Contractor shall waive rental payments during any time period that equipment fails to operate properly or is otherwise inoperable through no fault of Company Group. In all instances Contractor shall respond in a timely manner to repair or replace the equipment. Equipment misused by Company Group will be either repaired or replaced at Company's option and at Company's cost and expense. Equipment repaired or replaced by Company will, at a minimum, meet the condition of the equipment upon delivery to Company, less normal wear and tear during Company's use.

9.4 **Vessel Warranty** – Contractor warrants that all crew and vessels used in connection with the performance of this Agreement will satisfy those warranties set forth in Exhibit "G."

9.5 **Inspections** - Company may inspect the Work at any time, but failure to inspect or to discover or reject non-conforming or defective Work shall not imply acceptance thereof or waiver of any rights hereunder. If Company Group inspectors request that the finished Work be dismantled and it is found that no defects exist, Company shall bear the actual expense of dismantling, repairing and replacing of the dismantled portion of the finished Work, but if a defect is discovered, Contractor shall bear the expense of dismantling, repairing and replacing the defective Work and restoring the Work to its proper condition. If it is not practical for Contractor to make repairs, or at Company's option, Company shall have the right to engage another contractor, at the sole cost and expense of Contractor, for any dismantling, repairing and replacing of defective Work.

9

**Exhibit A**

9.6     <u>Company Representative</u> - Company, by written notice to Contractor, may designate one or more Company representatives (collectively, "Company Representative") who shall be authorized to act on behalf of Company.  The Company Representative shall be authorized to certify, on behalf of Company, periodic estimates of Work completed which are submitted by Contractor and to bind Company to any Work Order executed pursuant to this Agreement; provided, however that the Company Representative shall not have the authority to amend, modify, change or other vary the terms of this Agreement unless expressly authorized in writing to do so by a duly authorized officer of Company.

9.7     <u>Contractor Representative</u> - Contractor, by written notice to Company, shall designate one or more Contractor representatives (collectively, "Contractor Representative") who shall be authorized to act on behalf of Contractor.  The Contractor Representative shall be authorized to bind Contractor to any Work Order executed pursuant to this Agreement. Copies of this Agreement shall be furnished by Contractor to, and at all times shall be in the possession of, the Contractor Representative.

## 10.     CHANGES AND/OR ADDITIONS TO THE WORK

Company may order additions, deletions or make changes, to the scope of Work, provided such additions and/or changes are reasonably related to the scope of work.  No extra work or change shall be performed unless a written authorization has been issued by Company, or a separate written estimate has been submitted by Contractor to Company, and agreed to in writing by Company.  This authorization or estimate shall state the extension of time, if any, allowed and specifically provide for the cost for this addition or change to the Work, which shall be either:

(a)     A fixed sum agreed upon in writing before such Work is performed, or if the Parties do not agree on a fixed sum, then,

(b)     In accordance with the rates contained in the Work Order, of, if not applicable, Contractor's Rental Rate Schedule, attached as Exhibit "A".  A daily statement of such additions or changes to the Work shall be delivered to Company in accordance with the provisions of Article 6.

## 11.     INDEMNITY

11.1     <u>Company's Indemnity of Contractor for Damage Suffered by Company Group</u> - COMPANY AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF PERFORMANCE OF THIS AGREEMENT, REGARDLESS OF FAULT, INVOLVING:

(a)     DAMAGE TO OR LOSS OF ANY EQUIPMENT OR PROPERTY OF ANY MEMBER OF THE COMPANY GROUP, OR

(b)     PERSONAL INJURY, ILLNESS, OR DEATH OF ANY MEMBER OF COMPANY GROUP

11.2     <u>Contractor's Indemnity of Company Group for Damage Suffered by Contractor Group</u> - CONTRACTOR AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP FROM AND AGAINST ANY AND

10

Exhibit A

**ALL CLAIMS ARISING OUT OF PERFORMANCE OF THIS AGREEMENT, REGARDLESS OF FAULT, INVOLVING:**

> **(a)    DAMAGE TO OR LOSS OF ANY EQUIPMENT OR PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP, OR**

> **(b)    PERSONAL INJURY, ILLNESS, OR DEATH OF ANY MEMBER OF CONTRACTOR GROUP**

The indemnity obligations set forth in this Section 11.2 shall apply even if any member of the Contractor Group is determined to be the statutory or borrowed employee of any member of the Company Group, under Louisiana or other jurisdiction's applicable law.

11.3    **Company's Indemnity of Contractor Group for Environmental Damage** - Subject to the indemnity obligations contained in Sections 11.1 and 11.2. immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **COMPANY AGREES TO BE RESPONSIBLE FOR AND RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP AGAINST CLAIMS ARISING IN CONNECTION WITH, ARISING OUT OF, OR RESULTING FROM POLLUTION OR CONTAMINATION (INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION AND CLEANUP OF ALL POLLUTION OR CONTAMINATION) WHICH ORIGINATES FROM THE PROPERTY OF COMPANY GROUP, REGARDLESS OF FAULT.**

11.4    **Contractor's Indemnity of Company Group for Environmental Damage** - Subject to the indemnity obligations contained in Sections 11.1 and 11.2 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **CONTRACTOR AGREES TO BE RESPONSIBLE FOR AND RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP AGAINST CLAIMS ARISING IN CONNECTION WITH, ARISING OUT OF, OR RESULTING FROM POLLUTION OR CONTAMINATION (INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION AND CLEANUP OF ALL POLLUTION OR CONTAMINATION) WHICH ORIGINATES FROM THE PROPERTY OF CONTRACTOR GROUP, REGARDLESS OF FAULT.**

11.5    **Company's Indemnity of Contractor Group for Damage to Third Parties** - Subject to the indemnity obligations contained in Sections 11.1, 11.2. 11.3 and 11.4 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **COMPANY AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FROM AND AGAINST ANY CLAIM INVOLVING DAMAGE TO PROPERTY OR PERSONAL INJURY OR DEATH TO ANY THIRD PARTY TO THE EXTENT CAUSED BY OR ARISING OUT OF THE ACTION OR INACTION OF COMPANY GROUP, BUT ONLY TO THE EXTENT OF COMPANY GROUP'S PROPORTIONATE NEGLIGENCE OR FAULT.**

11.6    **Contractor's Indemnity of Company Group for Damage to Third Parties** - Subject to the indemnity obligations contained in Sections 11.1, 11.2. 11.3 and 11.4 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **CONTRACTOR AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP FROM AND AGAINST ANY CLAIM INVOLVING DAMAGE TO PROPERTY OR PERSONAL INJURY OR DEATH TO ANY THIRD PARTY**

11

Exhibit A

TO THE EXTENT CAUSED BY OR ARISING OUT OF THE ACTION OR INACTION OF CONTRACTOR GROUP, BUT ONLY TO THE EXTENT OF CONTRACTOR GROUP'S PROPORTIONATE NEGLIGENCE OR FAULT.

11.7 **Removal of Debris and Wreckage** - Contractor shall promptly remove all debris and wreckage of the property of Contractor Group to the extent requested by Company. CONTRACTOR AGREES TO BE RESPONSIBLE FOR AND RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP FOR THE COSTS OR REMOVAL OF CONTRACTOR GROUP PROPERTY AND FROM AND AGAINST CLAIMS ARISING OUT OF OR RESULTING FROM ANY OBLIGATION WHATSOEVER TO REMOVE SAID DEBRIS OR WRECKAGE, REGARDLESS OF FAULT.

11.8 **Intellectual Property** - In addition to any other indemnity provisions contained in this Agreement, Contractor represents and warrants that the use or construction of any and all tools, equipment, and other materials furnished by Contractor Group under this Agreement does not infringe on any license or patent issued or applied for, and CONTRACTOR AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP FROM AND AGAINST ANY AND ALL CLAIMS OR ACTIONS OF EVERY KIND AND CHARACTER IN FAVOR OF OR MADE BY AN ALLEGED OWNER OF INTELLECTUAL PROPERTY RIGHTS OR ANY CLAIMANT OF ANY RIGHTS OR PRIORITY TO SUCH TOOL OR EQUIPMENT, OR THE USE OR CONSTRUCTION THEREOF, THAT MAY RESULT FROM OR ARISE OUT OF FURNISHING OR THE USE OF ANY SUCH TOOLS, EQUIPMENT AND OTHER MATERIALS BY FURNISHED BY CONTRACTOR GROUP; except to the extent such Claims result from Contractor's compliance with: (a) designs and/or specifications furnished by Company (unless originated with Contractor), or (b) specific written instructions given by Company, for the purpose of directing the manner in which Contractor shall perform the Work.

11.9 Not Used.

11.10 **Insurance in Support of Indemnities** - In support of the mutual indemnity obligations, duties and liabilities each Party assumes in this Agreement, each Party, as indemnitor, agrees, at its own cost, to obtain and maintain, for the benefit of the other Party (and its respective Group) as indemnitees, liability insurance with minimum limits and coverages not less than those required under Article 12 of this Agreement; and, in particular, in the event this Agreement is subject to the indemnity limitations in Chapter 127 of the Texas Civil Practices and Remedies Code (or any successor statute) or similar statute of another jurisdiction, and so long as such limitations are in force, each Party covenants and agrees to support the mutual indemnity and release obligations contained in this Article 11 by carrying insurance (or qualified self-insurance) of the types and in the amounts not less than those specified in Article 12 and Exhibit "C". Notwithstanding any other provision of this Agreement, the Parties agree that its obligations, duties, and liabilities under this Article 11 are independent of all other provisions of this Agreement, including, but not limited to, Article 12 and accordingly shall not be limited, restricted, or in any way affected by any other provision of this Agreement except to the extent mandated by applicable law, and that the insurance requirements and the indemnity provisions shall be separate and distinct obligations and shall be separately and independently enforceable

12

Exhibit A

11.11 **Consequential Damages** - WITH THE EXCEPTION OF SECTIONS 11.5 AND 11.6, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE PARTIES AGREE AND UNDERSTAND THAT THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT DO NOT INCLUDE AND NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT UNDER ANY LAWS OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT, LOSS OF PRODUCT, LOSS OF RESERVES, LOSS OR INABILITY TO USE PROPERTY AND EQUIPMENT, AND BUSINESS INTERRUPTION, LOST OPPORTUNITY, HOWEVER SAME MAY BE CAUSED, REGARDLESS OF OWNERSHIP, REGARDLESS OF WHETHER OR NOT OCCASIONED BY OR RESULTING FROM NEGLIGENCE, STRICT LIABILITY, BREACH OF WARRANTY OR OTHER FAULT OF EITHER PARTY (OR ANY MEMBER OF ITS RESPECTIVE GROUP), AS THE CASE MAY BE, IN WHOLE OR PART, WHETHER SOLE, JOINT, ACTIVE OR PASSIVE, EXCEPTING ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT COMMITTED BY EITHER PARTY OR ANY MEMBER OF ITS RESPECTIVE GROUP ("CONSEQUENTIAL LOSS"). IN ADDITION, AND NOTWITHSTANDING ANY PROVISION TO THE CONTRARY ELSEWHERE IN THE AGREEMENT, COMPANY SHALL SAVE, INDEMNIFY, DEFEND AND HOLD HARMLESS CONTRACTOR GROUP FROM COMPANY GROUP'S OWN CONSEQUENTIAL LOSS AND CONTRACTOR SHALL SAVE, INDEMNIFY, DEFEND AND HOLD HARMLESS COMPANY GROUP FROM CONTRACTOR GROUP'S OWN CONSEQUENTIAL LOSS.

11.12 **Third-Party Beneficiaries** - It is the intent of the Parties to create a third party beneficiary obligation in favor of the members of each Party's respective Group, but to no others.

11.13 **Attorney's Fees** - In the event either Party fails to furnish a defense and indemnity as provided for herein, the other Party shall be entitled to receive from the offending Party, in addition to its attorneys' fees, costs, expenses and any amounts paid in judgment or settlement, all costs, expenses, and attorneys' fees incurred in the enforcement of this Agreement. Furthermore, the prevailing Party in any litigation relating to this Agreement, other than that involving defense and indemnity which is addressed above, shall be entitled to recover its reasonable and necessary attorneys' fees and costs of litigation from the other Party.

## 12. INSURANCE

12.1 **Insurance to be Carried** – Both Contractor and Company shall each maintain at its sole cost the insurance coverage set forth in Exhibit "C" with companies having an A.M. Best's rating of "A-" or better (or other reputable insurance rating organization of "secure" or better) with full policy limits applying, but not less than as stated in Exhibit "C".

12.2 **Waiver of Subrogation and Additional Insured Status** - All insurance policies of Contractor and Company related to the Work, whether or not required by this Agreement, shall, as respects liabilities assumed by Contractor and/or Company , (i) waive subrogation against the other Group, (ii) name the other Group as an additional insured (except for Workmen's Compensation coverage), and (iii) be primary (and not concurrent or excess over other valid insurance which may be available to the other or

13

Exhibit A

any member of the other Group) as respects any other coverage in favor of the other Group.

       12.3  **Insurance Certificates** - Prior to commencement of any Work, Contractor and Company shall deliver to the other a certificate evidencing the required coverages in compliance with this Article 12, provided that neither Company's nor Contractor's acceptance of an incomplete or improper certificate, nor commencement of Work or payment for any Work hereunder, shall constitute a waiver of any rights of the other. These certificates shall provide that any termination, non-renewal, or change materially restricting or reducing coverage or the cancellation of any policies under which certificates are issued shall not be valid as respects the other Group until it has received thirty (30) days advance written notice of such change or cancellation.

12.4  **Failure to Carry Insurance** - Contractor and Company agree to comply with all terms of the insurance contracts referenced in this Article 12. Failure of Contractor or Company to keep the required insurance policies in full force and effect during the term of this Agreement and during any extensions shall constitute a material breach of this Agreement and the Contractor and Company shall be responsible for whatever coverage should have been obtained and the other shall have the right, in addition to any other rights it may have, to immediately terminate this Agreement without further liability to the other. Nothing contained in these provisions relating to coverage and amounts set out herein shall operate as a limitation of Contractor's or Company's liability in tort or contracted for under the terms of this Agreement. Should coverage be provided on a claims-made basis, the policy shall include at least a three (3) year extended reporting period endorsement, and shall not contain a "prior acts" exclusion.

       12.6  **Scope of Insurance Coverage** - It is the intention of the Parties that the insurance coverages provided by Contractor and Company in fulfillment of these obligations be as broad as possible. Contractor and Company agree that in no event will any insurance policy obtained by Contractor or Company exclude coverage for the other Group because (1) a claim is made alleging (a) personal injury, death or property damage of the other's employees, (b) personal injury, death or property damage resulting from the negligence of Company or Contractor, or any member of the Company Group or the Contractor Group, or any other entity, or (c) personal injury, death or property damage resulting from the sudden or accidental release, discharge or dispersal of chemicals, liquids, gasses, waste materials or pollutants, or (2) the indemnity provisions of this Agreement are inapplicable or otherwise unenforceable.

       12.7  **Information to be Provided to Insurers** - Contractor and Company shall each provide a copy of Articles 11 and 12 hereof to its insurance carrier and require the carriers to provide insurance coverage that complies with both sections.

       12.8  **Expense Associated with being Named Additional Insured** - Contractor and Company agree that as respects all Work performed in Louisiana (or offshore Louisiana), or in Texas (or offshore Texas), Company will pay to Contractor's insurers (or their agent or representative) and Contractor will pay to Company's insurer the premium required by the other's insurers for extending all of the other's insurance policies to include coverage for the other Group as required under Article 12 of this Agreement. Contractor and Company will arrange to have the other billed for that premium by the other's insurers (or their agent or representative), and each will advise the other prior to the inception of this Agreement if such premium will be in excess of $2500. At each subsequent renewal of

14

**Exhibit A**

the insurance coverages, Contractor and Company will advise the other as respects the amount of the premium required for such extensions and arrange to have the other billed for the appropriate premium by their insurers (or their agent or representative). Contractor and Company warrant that such amounts constitute the full cost of extending such insurance protection to the other Group.

## 13.   ACCEPTANCE OF WORK

Company shall inspect the Work upon completion, to ensure Contractor's performance and compliance with this Agreement, the applicable Work Order, including drawings, specifications, and project conditions, if any, that may be furnished by Company; and, if not in compliance, Company will provide Contractor with a list of all items not in compliance and Contractor will timely and diligently correct such item; and if in compliance, Company shall, unless otherwise provided, give a written acceptance of the Work performed. Any acceptance by Company shall not relieve Contractor of any guarantees or obligations, or waive any of Company's rights.

## 14.   CONFIDENTIALITY

14.1   **Confidential Information** - The Parties, in the course of negotiations and performance of this Agreement and subsequent relationships with each other, may have access to financial, accounting, statistical, personnel, client or other technical or business information of the other Party or its subsidiaries or affiliated companies, and, in the case of Company, information from a party from whom Company is performing services of which the Work forms a part which information is and shall be deemed for all purposes under this Agreement as trade secrets. Except as otherwise provided in this Agreement, all such information, including, without limitation, information obtained as a result of performance the Work, shall be considered "Confidential Information".

14.2   **Use of Confidential Information** - Each Party agrees to hold all Confidential Information in confidence, agrees not to disclose the Confidential Information to any Third Party without the written consent of the other Party, and will use the Confidential Information solely in connection with the performance of this Agreement. The Parties may disclose Confidential Information to their employees, agents or subcontractors to whom disclosure is necessary for the purpose of performing the Work, but only under terms and conditions which protect the confidentiality of the Confidential Information as required by this Agreement. The Parties shall be responsible for any unauthorized disclosure of Confidential Information by anyone in its respective Group.

14.3   **Exceptions** - The obligations imposed by this Agreement shall not apply to any Confidential Information that:

(a)   is already in the possession of the receiving Party on the Effective Date of this Agreement (except Confidential Information in connection with bids, negotiations and/or discussions leading to the execution of this Agreement) or is independently developed by the receiving Party; or

(b)   is or becomes publicly available through no fault of the receiving Party; or

15

Exhibit A

(c)    is obtained by the receiving Party from a Third Party who is under no obligation of confidence to the disclosing Party; or

(d)    for which disclosure is required by law, but only after first notifying the disclosing Party of such required disclosure.

14.4    **Term of Confidentiality** - The obligations set forth in this Article 14 shall survive termination of this Agreement for a period of five (5) years from termination of the Work to which the Confidential Information relates.

## 15.    ASSIGNMENT

Contractor shall have the right to hire subcontractors to assist in performing the Work, but Contractor shall be responsible for said subcontractors and their performance. However, Contractor shall not assign this Agreement, or any Work Order, without Company's prior written consent. Any such subcontract or assignment shall not relieve Contractor of any liability for the performance of this Agreement. Company may assign this Agreement, or any Work Order, to any parent, subsidiary, related or affiliated corporation, partnership, or limited liability company, whether now existing or hereafter constituted, or any party from whom Company is performing services of which the Work forms a part and Contractor hereby consents to such assignment.

## 16.    FORCE MAJEURE

16.1    **Definition** - For the purpose of this Agreement, "Force Majeure" shall mean any other occurrence not within the reasonable control of the Party affected, including, by way of illustration, but not limited to, an act of God, an act of the public enemy, strike, lockout, boycott, picketing, riot, insurrection, fire, or any governmental law, order, rule, regulation or ordinance.

16.2    **Obligations Suspended** - If either Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations (except financial obligations) under this Agreement, it is agreed that on such Party's giving notice and reasonably full particulars of such Force Majeure in writing or by facsimile to the other Party within a reasonable time after the occurrence of the cause relied on, then the obligations of the Party giving such notice, so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall so far as possible be remedied with all reasonable dispatch. The obligation to make payments hereunder shall not be relieved, delayed or excused by any such Force Majeure condition.

16.3    **Labor Disputes** - It is understood and agreed that the settlement of strikes and lockouts shall be entirely within the discretion of the Party asserting Force Majeure as the excuse for non-performance, and that the above requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of an opposing Party when such course is inadvisable in the discretion of the Party asserting Force Majeure.

## 17.    AUDITS

Contractor shall maintain during the course of this Agreement, and retain for not less than three (3) years after the Work in question have been performed, complete and

16

Exhibit A

accurate records of all of Contractor's charges and documentation of items which are chargeable to Company under this Agreement. Company and/or any party from whom Company is performing services of which the Work forms a part shall have the right at any reasonable time during that period and during normal business hours to inspect and audit those records by authorized representatives of its own or any third-party consultant selected by it. The records to be thus maintained and retained by Contractor shall include all records required to verify the accuracy of Contractor's charges. If such audit reveals a discrepancy between the amount or value of materials or services billed to Company and that which is evidenced by Contractor's books and records, Company shall have the right to adjust its account with Contractor, which adjustment may necessitate a refund of funds disbursed to Contractor. If Company is unable to gain access to the pertinent records of any of the Contractor's subcontractors or vendors, Contractor will expend every effort to assist Company in obtaining this information.

18. **NOTICES**

All notices necessary to be given under the terms of this Agreement, except as herein otherwise provided, shall be effective upon receipt and shall be in writing and communicated by prepaid mail, telegram or facsimile transmission addressed to the respective parties at the address below or to such other address as respectively designated hereafter in writing from time to time:

To Company:　JAB Energy Solutions II LLC
262 North Sam Houston Pkwy East
Suite 230
Houston, Texas 77060

Attn:　Brent Boudreaux
Office:　281-260-7500

To Contractor:　**Turnkey Offshore Project Services LLC**
**8506 Shrimpers Row**
Dulac, LA 70350

Attn: Jay Henderson
Office: 985-563-7801

19. **CONFLICTS OF INTEREST**

No Contractor employee, agent, officer, director, or subcontractor shall give, or cause to be given, to any employee (or their immediate family) of Company any gift, entertainment, travel, payment, loan, or service. Gifts of nominal value and entertainment, meals and social invitations that are customary and proper under the circumstances and do not place the recipient under obligation, or the appearance of obligation, of any sort, are acceptable. Nor will Contractor's employees, agents, officers, directors, or subcontractors provide direct or indirect employment to family members of active employees of Company without written approval of a duly authorized Company officer. Also any arrangement by Contractor to enter into any direct or indirect business arrangement with any employee or agent of Company is prohibited. Company may audit pertinent Contractor, subcontractor,

17

Exhibit A

or vendor records to confirm compliance with this paragraph. If Company cannot gain access to pertinent records of any of Contractor's subcontractors or vendors, Contractor will expend every effort to assist Company in obtaining the requested information from Contractor's subcontractors and vendors necessary for a complete audit to confirm compliance with the above paragraph.

**20.   SUBSTANCE ABUSE**

Contractor agrees to abide by the terms of the substance abuse requirements in attached Exhibit "E".

**21.   COMPLIANCE WITH APPLICABLE LAWS**

21.1   **Posting of Notices** - Contractor agrees to keep posted all notices required under workers' compensation laws and other laws, ordinances, rules, or regulations of any governmental authority having jurisdiction over the Work.

21.2   **Contractor's Obligation and Indemnification of Company** - Contractor agrees to comply, and shall ensure that all members of the Contractor Group comply, with all federal, state, tribal, county, municipal and other laws, rules, regulations, and ordinances applicable to the performance of this Agreement. **CONTRACTOR AGREES TO BE RESPONSIBLE FOR, AND HEREBY AGREES TO DEFEND, RELEASE, INDEMNIFY AND HOLD HARMLESS COMPANY GROUP AGAINST FINES, PENALITIES AND OTHER SIMILAR ASSESSMENTS IMPOSED OR ASSESSED AGAINST CONTRACTOR GROUP OR COMPANY GROUP AS A RESULT OF CONTRACTOR GROUP'S FAILURE TO COMPLY WITH ANY APPLICABLE LAWS, RULES, REGULATIONS AND ORDINANCES**

**22.   EQUAL EMPLOYMENT OPPORTUNITY**

Contractor agrees to abide by the terms of the Equal Employment Opportunity requirements in attached Exhibit "F".

**23.   ANNOUNCEMENTS AND PRESS RELEASES**

Contractor agrees that during and after the term of this Agreement, it will make no announcements, press releases or other publications concerning the Work without the prior written consent of Company's authorized officer, except that Contractor may identify Company as a customer and client.

**24.   OWNERSHIP OF DATA**

All data and information related to the Work, and generated by or for Contractor and its subcontractors and vendors during the performance of the Work, shall be the sole property of Company. Contractor agrees to destroy all draft copies of reports when subsequent final copies of those reports are generated.

**25.   APPLICABLE LAW**

18

Exhibit A

The Parties recognize and agree that Work that may be performed by Contractor for Company may be performed at numerous locations, and at times simultaneously, and as a result could be subject to the laws of various jurisdictions. In order to provide certainty and predictability with regard to the interpretation of the provisions of this Agreement, the Parties, knowingly and willingly agree that this Agreement shall be governed by and interpreted in accordance with **GENERAL MARITIME LAW, BUT IF GENERAL MARITIME LAW IS NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS (EXCLUSIVE OF ANY PRINCIPLES OF CONFLICTS OF LAWS WHICH WOULD DIRECT APPLICATION OF THE SUBSTANTIVE LAWS OF ANOTHER JURISDICTION) SHALL GOVERN.** In the event of a dispute over the meaning or application of this Agreement, it shall be construed fairly and reasonably and neither more strongly for nor against either Party.

26. **SEVERABILITY**

If any part, term or provision of this Agreement is held by a court of competent jurisdiction to be unenforceable or in conflict with any applicable law, the validity of the remaining portions or provisions shall not be affected by such determination. Any term or provision so held to be unenforceable or in conflict with applicable law shall be deemed amended to the minimum extent necessary to comply with such law.

27. **SURVIVAL**

The indemnity, insurance, audit, confidentiality and related provisions of this Agreement (as well as any other provisions as may be identified expressly herein or which by their nature are intended to survive termination) shall survive termination of this Agreement.

28. **WAIVER**

The failure of either Party hereto at any time to require performance by the other Party of any provision of this Agreement shall in no way effect the right of such Party thereafter to enforce the same, nor shall any waiver of any breach of any provision hereof by the other Party be taken or held to be a waiver by such Party of any succeeding breach of such provision, or as a waiver of the provision itself.

29. **PERSONAL CONTRACT**

This Agreement shall be deemed a personal contract of Contractor, which waives all benefits of the Shipowner's Limitation of Liability Act, 46 U.S.C. § 183, et seq. or any other similar laws as to Company Group. Neither Contractor nor its underwriters shall be entitled to claim the benefits of such limitation of liability statute in respect of Claims asserted by Company Group. The purpose of this Article is to insure by specific contractual agreement that Company Group are able to enforce all indemnity obligations and insurance coverage for their benefit under this Agreement to the maximum extent permitted by law. Nothing in this paragraph is intended to prevent Contractor or its underwriters from asserting all applicable limitation of liability defenses or Claims by persons or entities not specifically defined as Company Group under this Agreement.

30. **CITIZENSHIP OF CONTRACTOR'S PERSONNEL**

Exhibit A

Contractor certifies that none of Contractor's personnel who perform Work pursuant to this Agreement are unauthorized aliens as defined in The Immigration Reform and Control Act of 1986 and the rules and regulations promulgated pursuant thereto, all as amended from time to time. Contractor agrees, as required, to obtain a substantially similar certification from its contractors or subcontractors performing Work related to this Agreement. Contractor further agrees, if requested, to provide proof of citizenship of Contractor's personnel who perform Work pursuant to this Agreement.

31.   **SECTION HEADINGS**

The article or section headings appearing in this Agreement have been inserted for the purpose of convenience and ready reference. They do not purport to, and shall not be deemed to define, limit or extend the scope or intent of the sections to which they appertain.

32.   **EXHIBITS**

The following exhibits are attached hereto and made a part hereof:

Exhibit "A"   - Services Work Order and Pricing
Exhibit "C"   - Insurance
Exhibit "D"   - Contractor Safety Management (By Contractor)
Exhibit "E"   - Substance Abuse (By Contractor)
Exhibit "F"   - Equal Employment Opportunity (By Contractor)
Exhibit "G"   - Special Terms and Conditions for the Provision of Vessels

33.   **CONFLICTS**

If conflicts exist between this Agreement and any other writing, this Agreement shall control, unless the other writing specifically references this Agreement and the Parties' intent that the other writing control, and such other writing is executed by authorized officers of the Parties. Further, if conflicts exist between the body of this Agreement and the Exhibits attached to this Agreement, then the body of this Agreement shall control, unless the Exhibit expressly provides otherwise.

34.   **ENTIRE AGREEMENT**

This Agreement supersedes all prior oral or written proposals, communications or other agreements related to the subject matter of this Agreement. This Agreement sets forth the entire agreement between the Parties with regard to the subject matter of this Agreement and no amendment shall be binding upon the Parties unless in writing and signed by authorized officers of both Parties. In addition, in the event of any conflict this Agreement shall control over any subsequent writing between the Parties unless the intent to amend or supercede this Agreement is expressly stated in a writing executed by a representative of each party authorized to amend this Agreement.

35.   **COUNTERPARTS**

This Agreement may be executed in multiple counterparts, each of which shall be considered an original once Company and Contractor have executed a counterpart of this Agreement.

20

Exhibit A

**JAB Energy Solutions II LLC**

By: _Brent Boudreaux_

Name: _Brent Boudreaux_____

Title: _President_____

Date: _6/18/18_____

**Turnkey Offshore Project Services, LLC**

By: _____

Name: ___Jay Henderson_____

Title: _____Vice President_____

Date: _6-21-18_____

21

**Exhibit A**





TOPS
P.O. Box 9157, Houma, LA 70361
Phone 985-563-7801 Fax 985-563-4660

September 24, 2020

Attn: Brent Boudreaux

JAB Energy Solutions, LLC
262 North Sam Houston Pkwy
Suite 230
Houston, TX 77060

RE: HI 370 REVISED FROM
JULY 14, 2020 LETTER

Brent Boudreaux,

The following are rates that we can offer should Jab Energy decide it wants to perform work on a day rate basis this season. Please note clarifications on cost at bottom of page.

The anchor handling tug and the Derrick Barge day rate including anchor positioning, 24 hour operating crew, all mechanics, electricians, 6 welders, 7 riggers per shift, 1 barge superintendent, 2 welding foremen, and deck foreman to supervise all work will be $122,339.00 per day.

Quarters and meals for 52 men which includes 2 cooks and 4 galley hands will be $5,580.00 per day.

Total day rate will be $127,919.00 Per Day

## CLARIFICATIONS

- All third party cost can be supplied at cost plus 10%.
- All Crew boat runs would be billed at cost plus 10%.
- TOPS certified rigging inventory would be included. Any outside rigging would be at cost plus 10%.
- Quarters and meals above 52 men will be invoiced at $75.00 per man per day.
- Extra construction crew would be billed at $75.00 per hour.
- All fuel used would be charged at cost plus 10%.
- Cargo barges 260 x 72 will be provided at $2000.00 per day. 260 x 100 will be provided at $5500.00 per day.

**Exhibit B**

- All cargo barge tug and cost will be arranged by TOPS logistics and billed direct to client.
- TOPS will make the initial DB Swing Thompson and Anchor Handling Tug mobilization of roughly 27 hours for a lump sum of $115,000.00. The final Demob of the DB Swing Thompson and Anchor Handling Tug will be performed for a lump sum of $150,000.00.
- TOPS includes load spreaders and tie down braces with our cargo barge rates. Labor to set up the cargo barges will be invoiced at $75.00 per hour.

## WEATHER REDUCTION

- We are required to go to port for a tropical storm. All cost for tugs to demob inside would be at cost plus 10%.
- For shutdowns of productive work during inclement weather or tropical storms TOPS would reduce its rate by 10%.

Jay Henderson

Vice President

Exhibit B

**George Nalley**
_____

| | |
|---|---|
| **From:** | Jay Henderson <jay@hopeservicesinc.com> |
| **Sent:** | Wednesday, November 11, 2020 10:57 AM |
| **To:** | George Nalley; Rocky Henderson; Dan Black |
| **Subject:** | FW: jab documents |
| **Attachments:** | JAB ENERGY HI 370 BID LETTER REVISED.pdf |

The bid letter

**From:** Dan Black <dan@hopeservicesinc.com>
**Sent:** Thursday, September 24, 2020 11:40 AM
**To:** Brent Boudreaux <bboudreaux@jabenergysolutions.com>
**Cc:** Jay Henderson <jay@hopeservicesinc.com>
**Subject:** RE: HI 370A

Brent,
Attached is the revised proposal which addresses the mob/demob for your WO.

Thanks,

*Dan Black*
*Senior Project Manager*
*Turnkey Offshore Project Services*
*Office: 985-563-7801*
*Cell: 985-209-1311*


**From:** Brent Boudreaux [mailto:bboudreaux@jabenergysolutions.com]
**Sent:** Thursday, September 24, 2020 10:16 AM
**To:** Dan Black
**Subject:** RE: HI 370A

If it ok with you we can provide Crosby?

Brent Boudreaux
JAB Energy Solutions
19221 I 45 South
**Suite 324**
Shenandoah, Texas 77385
281-260-7500 office
281-204-7168 cell

## Please note we moved offices.

**From:** Dan Black <dan@hopeservicesinc.com>
**Sent:** Thursday, September 24, 2020 9:08 AM
**To:** Brent Boudreaux <bboudreaux@jabenergysolutions.com>
**Subject:** RE: HI 370A

**Exhibit B**

Brent,

We will provide you OUR cost for tugs from Crosby but if you have another source it may be worth looking into as Crosby is very proud. We are currently paying **$75.00/ton** for unprocessed scrap at our yard.

Thanks,

*Dan Black*
*Senior Project Manager*
*Turnkey Offshore Project Services*
*Office: 985-563-7801*
*Cell: 985-209-1311*

---

**From:** Brent Boudreaux [mailto:bboudreaux@jabenergysolutions.com]
**Sent:** Wednesday, September 23, 2020 12:52 PM
**To:** Dan Black
**Subject:** RE: HI 370A

I have the proposal it does not have the material barge tug cost?

Brent Boudreaux
JAB Energy Solutions
19221 I 45 South
**Suite 324**
Shenandoah, Texas 77385
281-260-7500 office
281-204-7168 cell

## Please note we moved offices.

**From:** Dan Black <dan@hopeservicesinc.com>
**Sent:** Wednesday, September 23, 2020 12:42 PM
**To:** Brent Boudreaux <bboudreaux@jabenergysolutions.com>
**Subject:** RE: HI 370A

Please see attached proposal and I will check on scrap. You could pay OTS direct if preferred. Our MB rate include load spreaders you will have to pay for the labor to set up which we do in Dulac.

Thanks,

*Dan Black*
*Senior Project Manager*
*Turnkey Offshore Project Services*
*Office: 985-563-7801*
*Cell: 985-209-1311*

---

**From:** Brent Boudreaux [mailto:bboudreaux@jabenergysolutions.com]
**Sent:** Wednesday, September 23, 2020 12:35 PM
**To:** Dan Black
**Subject:** RE: HI 370A

Dan

2

**Exhibit B**

I am working on the work order.

What is the material barge tug cost?
Will OTS bill JAB directly?
What about diving?
How much are you paying for scrap these days?

Thanks,

Brent Boudreaux
JAB Energy Solutions
19221 I 45 South
**Suite 324**
Shenandoah, Texas 77385
281-260-7500 office
281-204-7168 cell

## Please note we moved offices.

**From:** Dan Black <dan@hopeservicesinc.com>
**Sent:** Wednesday, July 15, 2020 2:05 PM
**To:** Brent Boudreaux <bboudreaux@jabenergysolutions.com>
**Subject:** HI 370A

Brent
Attached is our dayrate proposal for the HI 370A platform removal. Please let us know when you think you can mobilize as we may be available next week.

Thanks,

*Dan Black*
*Senior Project Manager*
*Turnkey Offshore Project Services*
*Office: 985-563-7801*
*Cell: 985-209-1311*

**Exhibit B**




## TOPS

P.O. Box 9157, Houma, LA 70361
Phone 985-563-7801 Fax 985-563-4660

July 14, 2020

Attn: Brent Boudreaux

JAB Energy Solutions, LLC
262 North Sam Houston Pkwy
Suite 230
Houston, TX 77060                              RE: HI 370

Brent Boudreaux,

The following are rates that we can offer should Jab Energy decide it wants to perform work on a day rate basis this season.  Please note clarifications on cost at bottom of page.

The anchor handling tug and the Derrick Barge day rate including anchor positioning, 24 hour operating crew, all mechanics, electricians, 6 welders, 7 riggers per shift, 1 barge superintendent, 2 welding foremen, and deck foreman to supervise all work will be $122,339.00 per day.

Quarters and meals for 52 men which includes 2 cooks and 4 galley hands will be $5,580.00 per day.

Total day rate will be $127,919.00 Per Day

### CLARIFICATIONS

- All third party cost can be supplied at cost plus 10%.
- All Crew boat runs would be billed at cost plus 10%.
- TOPS certified rigging inventory would be included. Any outside rigging would be at cost plus 10%.
- Quarters and meals above 52 men will be invoiced at $75.00 per man per day.
- Extra construction crew would be billed at $75.00 per hour.
- All fuel used would be charged at cost plus 10%.
- Cargo barges 260 x 72 will be provided at $2000.00 per day. 260 x 100 will be provided at $5500.00 per day.
- All cargo barge tug and cost will be arranged by TOPS logistics and billed direct to client.

**Exhibit B**

## WEATHER REDUCTION

- We are required to go to port for a tropical storm. All cost for tugs to demob inside would be at cost plus 10%.
- For shutdowns of productive work during inclement weather or tropical storms TOPS would reduce its rate by 10%.

Jay Henderson

Vice President

**EXHIBIT "A"**
**WORK ORDER 2020 No. 1**

Pursuant to Master Service Agreement ("Agreement") between Company and Contractor dated June _18___, 2018, this Work Order is issued in respect of the services to be supplied by Contractor as listed below:

## Part A: Services to be provided by CONTRACTOR

**General:**

Salvage operations at HI A 370 A (the "Work") are to be performed in accordance with the terms and conditions of the Parties Agreement, this Work Order – and any Addendums thereto, attached hereto as Annex 1 and as outlined below.

**Scope of Work:**

Contractor will be conducting Work generally following this basic sequence of activities including but not limited to:

- Set up on location
- Safe-out platform, as required
- Bring in material barge
- Remove helideck if required
- Remove production deck
- Sever piles and conductors (if required) with abrasives
- Remove conductors
- Install jacket lift rigging
- Lift jacket and secure to material barge (bottom section of jacket left for reef in place)
- Transport to shore for disposal jacket, deck, piles and conductors
- Demobilize

**Company Obligations:**

Company will provide the most current site maps available in order to locate surface and subsurface property, structures, facilities, pipelines, debris, seafloor impressions, can holes, etc.

Company will obtain, or cause to be obtained all necessary permits for the removal of platforms, jackets, pipeline abandonment, etc., and disposal of all platform components, and the use of explosives. Company shall contact, or cause to be contacted all necessary regulatory agencies regarding the decommissioning, removal and salvage of the Platforms and the ancillary facilities.

**Exhibit C**

Company will utilize the rigging on board the DB for all lifts within the capacity of said rigging, an inventory of the rigging shall be provided to Company (see Attachment 1). For all lifts outside the capacity of the barge rigging Company shall provide or cause to be provided rigging for major lifts.

Company believes to the best of its knowledge that the structural integrity of the structure is able to withstand the removal operations. Contractor will review all structure drawings before going on location and once on location Contractor will confirm structural integrity visually as possible and notify Company if there is an issue. If there are issues with the structural integrity all cost will be at Company's expense. In the event that the structure is not able to withstand the removal operations or if the structure requires additional structural modifications for sea-fastening, Company shall be liable for any and all costs for the modifications and for any damage to any property, structures or facilities, including all environmental liability, as well as any additional costs incurred by Contractor as a consequence of the structure's lack of structural integrity.

Materials and services provide to Company by Contractor outside of the scope of this Work Order shall be invoiced at cost plus 10%.

The Company SEMS program will be followed to ensure a safe work environment for the DB crews, and all 3rd party services.

Health, safety and environmental (HSE) considerations, safety analysis, and expectations (e.g., attending daily safety meetings, proper completion of a Job Safety Analysis (JSA), hazard identification and mitigation, and the obligation to review and sign off on the JSA for a new location when moved during a shift),
Step-by-step procedures for completing the given activity (including conducting a pre-job safety meeting and on-site walk through of the site to discuss scope of work, generating JSAs, and using Stop Work Authority if any unsafe event or item is noticed),
- JSA checklist
- Drawings for the facility
- Risk assessment that includes hazard identification, potential impacts, corrective controls, and assignment of responsibility to specific personnel for any open action items.

Note: any deviation from the work pack deemed necessary due to inaccurate onsite information provided or field adjustments to help complete the task in a more efficient/safer manor will require a MOC, JSA review, and Hazard review prior to changes in the plan. All major MOC's will be reviewed by Company and Shore and agreed to by both parties before commencing.

**Exhibit C**

Task specific Hazard Analysis and JSA's are to be reviewed on site where work will be performed to review potential hazards and mitigations enabling a more detailed review while observing the work area. Task specific Hazard Analysis and JSA's or a copy of the completed documents is to keep on site for review when needed or when additional personnel are moved to the work location. JSA's and Hazard analysis are to be reviewed by all personnel working in the area and signed attendance records are to be maintained

**Part B: Location and Period for the Services to be provided by CONTRACTOR**

Contractor is to remove HI A 370 A.

The Parties agree that Contractor will perform Works upon a mutually agreeable Schedule based upon availability of Contractors Vessel(s) and other equipment(s). Contactor's anticipated start date is on or around October 6, 2020.

**Part C: Compensation for the Services to be provided by CONTRACTOR**

Contractor shall be paid for the Work (including Vessel and equipment mobilization) in accordance with the hire rates and fees set forth below.

| 1 | DB Swing Thompson Spread | | | $127,919 |
|---|---|---|---|---|
| 2 | DB Swing Mobilization | | | $115,000 |
| 3 | DB Swing Demobilization | | | $150,000 |
| 4 | Cargo Barge 260x72 | | | $2,000/day |
| 5 | Cargo Barge 260x100 | | | $5500/day |

Material barge with deck, piles and conductors will be transported to the TOPS yard in Dulac for offload and disposal. TOPS will offload the barge, scrap the jacket, deck and conductors and pay to JAB for the sale of the scrap of the jacket, deck and conductors $75/ton.

Undisputed amounts shall be paid with in 60 days of receipt of the invoices by Company from Contractor.

**Exhibit C**

Company:
**JAB Energy Solutions II, LLC**

By: _Brent Boudreaux_

Name: _Brent Boudreaux_

Title: _President_

Date: _9-25-20_

Contractor:
**Turnkey Offshore Project Services LLC**

By: _Jay Henderson_

Name: _Jay Henderson_

Title: _Vice President_

Date: _9-24-20_

<span style="color:red">**Exhibit C**</span>

**Exhibit "A"**

**Contractor provided**

Included in Rate of DB Swing Thompson:

- D/B Swing Thompson
- Anchor Handling Tug
- 24-hour Construction crew 6 riggers, 6 welders per shift
o Deck Foreman's
o Leaderman
o Welder Foreman's
o Big Rig Operator's
o Deck Crane Operator's
- 24-hour barge Maintenance crew
- Fuel, Lube and Water for Derrick Barge and AHT
- Subsistence and Catering
- Survey
- Medic
- Room and Board for 4 Company provided personnel
o Additional $100 / per man per day beyond 4
- Jet String

**Exhibit C**



**TURNKEY OFFSHORE**
**PROJECT SERVICES, LLC**

# TURNKEY OFFSHORE PROJECT SERVICES
# DB SWING THOMPSON

### JOB COMPLETION CERTIFICATE

Client: Jab Energy
Location: HI A370
Job#: ST20-017
Date Started: 10-03-20
Date Completed: 12-08-20

This document certifies that TOPS DB Swing Thompson has safely and successfully performed the removal of 8 Pile Platform in 350' of water. The structure had (13) well conductors, (13) Well conductors were removed. The deck was removed in 2 sections, jacket legs were severed abrasively, and jacket was removed in 2 sections to the satisfaction of the Jab Energy Client Representative. Now we are preparing to move to next job.

The Job Completion Certificate is a record of completion for the above referenced project. It is being provided to client, via email, for review to document accuracy.
NOT THE CONTRACT. If you see any inaccuracy or omissions, please contact us immediately.

TOPS DB SWING THOMPSON SUPT

Jab Energy Representative

<span style="color:red">**Exhibit D**</span>

# TURNKEY OFFSHORE PROJECT SERVICES, LLC
P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

Invoice Number:   1551
Invoice Date:     Nov 16, 2020
Page:             1

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 12/16/20 |

| | | | | |
|---|---|---|---|---|
| 1.00 | OTHER | HI 370-A  FOR DB SWING THOMPSON & ANCHOR HANDLING TUG SPREAD MOBILIZATION TO HI 370-A | 115,000.00 | 115,000.00 |
| 1.00 | OTHER | HI 370-A DB SWING THOMPSON & ANCHOR HANDLING TUG DAY RATE FOR 10-4-20 18 HOURS @ $5330.00 | 95,940.00 | 95,940.00 |
| 1.00 | OTHER | HI 370-A DB SWING THOMPSON ^ ANCHOR HANDLING TUG WEATHER RATE TOR 10-4-20.  6 HOURS @ $4796.00 | 28,776.00 | 28,776.00 |
| 1.00 | OTHER | HI 370-A DB SWING THOMPSON & ANCHOR HANDLING TUG WEATHER RATE FOR 10-5-20 WEATHER DAY RATE $115127.00 | 115,127.00 | 115,127.00 |
| 1.00 | OTHER | HI 370-A DB SWING THOMPSON & ANCHOR HANDLING TUG WEATHER RATE FOR 10-6-20. WEATHER DAY RATE $115127.00 | 115,127.00 | 115,127.00 |

*Pd in full*

| | |
|---|---|
| Subtotal | 469,970.00 |
| Sales Tax | |
| Total Invoice Amount | 469,970.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1552 |
| Invoice Date: | Nov 19, 2020 |
| Page: | 1 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 12/18/20 |

| | | | | |
|---|---|---|---|---|
| | | HI 370-A SUPPORT VESSELS AND FUEL AS PER ATTACHED TICKETS. | | |
| 1.00 | THIRD PARTY CHARG | 10-10-20 - 10-12-20 M/V LANDON JAMES THREE (3) DAYS SUPPORT PROJECT LOGISTICS. | 6,630.00 | 6,630.00 |
| 1.00 | THIRD PARTY CHARG | 10-10-20 - 10-12-20 M/V LANDON JAMES | 7,466.14 | 7,466.14 |
| 1.00 | THIRD PARTY CHARG | 10-29-20 - 11-5-20 M/V RANDOLPH JOHN TRANSPORT SUPPORT OF PROJECT LOGISTICS. | 25,987.50 | 25,987.50 |
| 1.00 | THIRD PARTY CHARG | 10-29-20 - 11-2-20 M/V RANDOLPH JOHN USED 4300 GALLONS OF FUEL IN SUPPORT OF OPERATIONS. | 5,905.00 | 5,905.00 |
| 1.00 | THIRD PARTY CHARG | 10-3-20 - 10-5-20 SUPPORT OF LOGISTICS | 7,524.00 | 7,524.00 |
| 1.00 | THIRD PARTY CHARG | 10-3-20 - 10-5-20 2974 GALLONS OF FUEL AS PER BROUSSARD BROTHERS INVOICE #0042395 | 3,886.20 | 3,886.20 |
| 1.00 | THIRD PARTY CHARG | 10-12-20 - 10-21-20 M/V CAPTAIN LAB SUPPORT OF LOGISTICS 9.23 DAYS ON CHARTER. | 30,224.00 | 30,224.00 |
| 1.00 | THIRD PARTY CHARG | 10-12-20 - 10-21-20 M/V CAPTAIN LAB USED 5766 GALLONS OF FUEL AS PER INVOICES #0042423, 0042424, AND 0042429 | 8,245.38 | 8,245.38 |
| 1.00 | THIRD PARTY CHARG | 10-23-20 - 10-26-20 M/V RANDOLPH JOHN ASSISTING DB SWING THOMPSON | 13,475.00 | 13,475.00 |
| 1.00 | THIRD PARTY CHARG | COST PLUS 10% OF TOTAL INVOICE $109343.22 X 10% | 10,934.33 | 10,934.33 |

*Pd. in full*

| | |
|---|---|
| Subtotal | 120,277.55 |
| Sales Tax | |
| Total Invoice Amount | 120,277.55 |
| Payment/Credit Applied | 120,277.55 |

Check/Credit Memo No: WIRE 12-11-2020

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:      985-563-4660

# INVOICE

Invoice Number:   1553
Invoice Date:      Nov 19, 2020
Page:                 1

*Duplicate*

| | |
|---|---|
| JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 | JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 |

| | | | |
|---|---|---|---|
| JAB | | Net 30 Days | |
| | NONE | | 12/19/20 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| | | HI 370-A TAIL TUGS TO ASSIST WITH DB SWING THOMPSON AND TAIL TUGS FOR CARGO BARGE DUE TO HURRICANES. | | |
| 1.00 | THIRD PARTY CHARGES | 10-29-20 - 10-30-20  M/V BENNY G AND M/V UNCLE GEORGE ASSIST DB SWING THOMPSON FROM SABINE PASS. | 19,442.50 | 19,442.50 |
| 1.00 | THIRD PARTY CHARGES | 10-5-20 - 10-6-20  M/V CYNTHIA K AND M/V HF BEAN ASSIST DB SWING THOMPSON TO SABINE PASS | 14,910.00 | 14,910.00 |
| 1.00 | THIRD PARTY CHARGES | 10-10-20 - 10-11-20  M/V CYNTHIA K AND M/V HF BEAN ASSIST DB SWING THOMPSON OUT SABINE PASS | 9,450.00 | 9,450.00 |
| 1.00 | THIRD PARTY CHARGES | 10-26-20 - 10-28-20  M/V JANE OLIVIA ASSIST MM 27 TO PORT CITY | 7,026.68 | 7,026.68 |
| 1.00 | THIRD PARTY CHARGES | 10-26-20 - 10-27-20  M/V HF BEAN ASSIST DB SWING THOMPSON TO PORT CITY DOCK | 8,470.00 | 8,470.00 |
| 1.00 | THIRD PARTY CHARGES | 10-29-20 - 10-30-20  M/V BENNY G AND M/V UNCLE GEORGE ASSIST DB SWING THOMPSON OUT OF PORT CITY DOCK. | 19,442.50 | 19,442.50 |

Check/Credit Memo No:

| | |
|---|---|
| Subtotal | Continued |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment/Credit Applied | |

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1553 |
| Invoice Date: | Nov 19, 2020 |
| Page: | 2 |

*Duplicate*

| | |
|---|---|
| JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX 77385 | JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX 77385 |

| | | | |
|---|---|---|---|
| JAB | | | Net 30 Days |
| | NONE | | 12/19/20 |

| Quantity | | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | THIRD PARTY CHARGES | COST PLUS 10% OF TOTAL INVOICE<br>$78741.68 X 10% | 7,874.17 | 7,874.17 |

*$21,38675 Credit*
*29,722.45 Pd.*

*Balance Owed $35,506.65*

| | |
|---|---|
| Subtotal | 86,615.85 |
| Sales Tax | |
| Total Invoice Amount | 86,615.85 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# CREDIT MEMO

Credit Memo Number: 10067
Credit Date:        Jan 20, 2021
Page:               1

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | Customer PO | Sales Rep ID |
|---|---|---|
| JAB | | |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| -1.00 | CREDIT | CREDIT IS FOR THE 10% CHARGE ON $19442.50 FOR INVOICE #1553 | 1,944.75 | -1,944.75 |

|  |  |
|---|---|
| Subtotal | -1,944.75 |
| Sales Tax | |
| Freight | |
| TOTAL | -1,944.75 |

Invoice No

Exhibit E

**TURNKEY OFFSHORE PROJECT**
P.O. BOX 9157
HOUMA, LA 70361
USA

# CREDIT MEMO

Credit Memo Number: 10066
Credit Date:          Dec 18, 2020
Page:                 1

Voice:   985-563-7801
Fax:     985-563-4660

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | Customer PO | Sales Rep ID |
|---|---|---|
| JAB | | |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| -1.00 | THIRD PARTY CHARGES | 10-29-20 - 10-30-20  M/V BENNY G AND M/V UNCLE GEORGE ASSIST DB SWING THOMPSON OUT OF PORT CITY DOCK. CREDIT IS FOR INVOICE #1553 | 19,442.50 | -19,442.00 |

|  | | | Subtotal | -19,442.00 |
|  | | | Sales Tax | |
|  | | | Freight | |

Invoice No 1553

| | | | Total | -19,442.00 |

Exhibit E

# TURNKEY OFFSHORE PROJECT SERVICES, LLC
P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

Invoice Number: 1554
Invoice Date: Nov 19, 2020
Page: 1

*Duplicate*

**Bill To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

**Ship To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | | Payment Terms | |
|---|---|---|---|
| JAB | | Net 30 Days | |
| Sales Rep ID | | Shipping Method | Ship Date | Due Date |
| | | NONE | | 12/19/20 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | DB SPREAD HOURS | HI 370-A DB SWING THOMPSON RATES TO PERFORM REMOVAL AS DIRECTED BY JAB. AS PER ATTACHED SPREAD SHEET. | 3,101,958.00 | 3,101,958.00 |
| | | Subtotal | | 3,101,958.00 |
| | | Sales Tax | | |
| | | Total Invoice Amount | | 3,101,958.00 |
| | | Payment/Credit Applied | | |

Check/Credit Memo No:

**Exhibit E**

**TURNKEY OFFSHORE PROJECT**

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# CREDIT MEMO

Credit Memo Number: 10065
Credit Date:          Dec 18, 2020
Page:                 1

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | Customer PO | Sales Rep ID |
|---|---|---|
| JAB | | |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| -1.00 | DB SPREAD HOURS | HI 370-A CREDIT IS FOR ONE DAY WEATHER DAY RATE 10-27-20 - 10-30-20. CREDIT IS FOR INVOICE #1554 | 115,127.00 | -115,127.00 |
| | | Subtotal | | -115,127.00 |
| | | Sales Tax | | |
| | | Freight | | |

Invoice No  1554

| TOTAL | -115,127.00 |
|---|---|

**Exhibit E**

# TURNKEY OFFSHORE PROJECT

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# CREDIT MEMO

Credit Memo Number: 10064
Credit Date:        Nov 20, 2020
Page:               1

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| | | |
|---|---|---|
| JAB | | |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| -1.00 | CREDIT | 10-5-20 HI 370-A CREDIT FOR REDUCTION ON WELDERS AND FITTERS ON DOWNTIME FOR HURRICANE DELTA  10 X 12 X $31.00 = $3720.00 AND 11 X 12 X $48.00 = $6336.00 | 10,056.00 | -10,056.00 |
| -1.00 | CREDIT | 10-6-20 HI 370-A CREDIT FOR REDUCTION ON WELDERS AND FITTERS ON DOWNTIME FOR HURRICANE DELTA  10 X 12 X $31.00 = $3720.00 AND 11 X 12 X $48.00 = $6336.00 | 10,056.00 | -10,056.00 |
| -1.00 | CREDIT | 10-8-20 HI 370-A CREDIT FOR REDUCTION ON WELDERS AND FITTERS ON DOWNTIME FOR HURRICANE DELTA  10 X 12 X $31.00 = $3720.00 AND 11 X 12 X $48.00 = $6336.00 | 10,056.00 | -10,056.00 |
| -1.00 | CREDIT | 10-9-20 HI 370-A CREDIT FOR REDUCTION ON WELDERS AND FITTERS ON DOWNTIME FOR HURRICANE DELTA  10 X 12 X $31.00 = $3720.00 AND 11 X 12 X $48.00 = $6336.00 | 10,056.00 | -10,056.00 |
| -1.00 | CREDIT | 10-10-20 HI 370-A CREDIT FOR | 10,056.00 | -10,056.00 |

| | | |
|---|---|---|
| Subtotal | | Continued |
| Sales Tax | | Continued |
| Freight | | |
| Invoice No | TOTAL | Continued |

Exhibit E

**TURNKEY OFFSHORE PROJECT**
P.O. BOX 9157
HOUMA, LA 70361
USA

# CREDIT MEMO

Credit Memo Number: 10064
Credit Date:      Nov 20, 2020
Page:             2

Voice:  985-563-7801
Fax:    985-563-4660

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | Customer PO | Sales Rep ID |
|---|---|---|
| JAB | | |

| Quantity | Item | Description | List Price | Amount |
|---|---|---|---|---|
| -1.00 | CREDIT | REDUCTION ON WELDERS AND FITTERS ON DOWNTIME FOR HURRICANE DELTA  10 X 12 X $31.00 = $3720.00 AND 11 X 12 X $48.00 = $6336.00 10-26-20 - 10-30-20 CREDIT FOR REDUCTION OF CONSTRUCTION CREW WELDERS AND RIGGERS DURING HURRICANE ZETA. 6 WELDERS @ $48.00 X 12 HOURS @ 5 DAYS =$17280.00 | 17,280.00 | -17,280.00 |
| -1.00 | CREDIT | 10-26-20 - 10-30-20  10 RIGGERS @ $48.00 X 12 HOURS @ 5 DAYS = $18600.00 CREDIT IS FOR INVOICE #1554 | 18,600.00 | -18,600.00 |

| | | |
|---|---|---|
| Subtotal | | -86,160.00 |
| Sales Tax | | |
| Freight | | |
| TOTAL | | -86,160.00 |

Invoice No

**Exhibit E**

**TURNKEY OFFSHORE PROJECT SERVICES, LLC**
P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

Invoice Number:  1555
Invoice Date:    Nov 19, 2020
Page:            1

| Bill To: | Ship To: |
|---|---|
| JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 | JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 |

| Customer ID | Customer PO | Payment Terms |
|---|---|---|
| JAB | | Net 30 Days |

| Sales Rep ID | Shipping Method | Ship Date | Due Date |
|---|---|---|---|
| | NONE | | 12/19/20 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| | | HI 370-A DOCK CHARGES DUE TO DB SWING THOMPSON HAVING TO STAND BY FOR HURRICANES DELTA, LAURA, AND ZETA | | |
| 1.00 | THIRD PARTY CHARGES | 10-6-20 - 10-11-20  DB SWING THOMPSON $1600/DAY AND MM 27 $1140/DAY  PORT CITY HOLDINGS SAFE HARBOR | 16,440.00 | 16,440.00 |
| 1.00 | THIRD PARTY CHARGES | 10-26-20 - 10-30-20  DB SWING THOMPSON $1600/DAY AND MM 27 1140/DAY  PORT CITY HOLDINGS SAFE HARBOR | 12,100.00 | 12,100.00 |
| 1.00 | THIRD PARTY CHARGES | 10-31-20 - 11-10-20  DB SWING THOMPSON $1600/DAY, MM 27 $1140/DAY, AND CROSBY LEGACY $520/DAY    PORT CITY HOLDING SAFE HARBOR | 23,140.00 | 23,140.00 |
| 1.00 | THIRD PARTY CHARGES | 11-15-20  DEMOB CONTRACTORS FOR WEATHER DOWNTIME | 300.00 | 300.00 |
| 1.00 | THIRD PARTY CHARGES | 10-16-20  BROUSSARD BROTHERS LOAD OUT | 282.00 | 282.00 |

| | |
|---|---|
| Subtotal | Continued |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC
P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1555 |
| Invoice Date: | Nov 19, 2020 |
| Page: | 2 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

| | | | |
|---|---|---|---|
| JAB | | | Net 30 Days |
| | NONE | | 12/19/20 |

| | | | | |
|---|---|---|---|---|
| 1.00 | THIRD PARTY CHARGES | 10-12-20  BROUSSARD BROTHERS LOAD OUT | 804.00 | 804.00 |
| 1.00 | THIRD PARTY CHARGES | COST PLUS 10% OF TOTAL INVOICE $53066.00 X 10% | 5,306.60 | 5,306.60 |

| | |
|---|---|
| Subtotal | 58,372.60 |
| Sales Tax | |
| Total Invoice Amount | 58,372.60 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

**TURNKEY OFFSHORE PROJECT SERVICES, LLC**
P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:  985-563-7801
Fax:    985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1556 |
| Invoice Date: | Nov 23, 2020 |
| Page: | 1 |

**Bill To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

**Ship To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

| Customer ID | | Payment Terms |
|---|---|---|
| JAB | | Net 30 Days |

| Sales Rep ID | Shipping Method | Ship Date | Due Date |
|---|---|---|---|
| | NONE | | 12/23/20 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| | | HI 370-A CARGO BARGES MM 27 AND MM 262 WORKING ON THE PROJECT AS DIRECTED. | | |
| 46.00 | CARGO SPREAD | MM 27 - 10-1-2020 TO 11-15-2020 AT $2000.00 PER DAY. | 2,000.00 | 92,000.00 |
| 42.00 | CARGO SPREAD | MM 262 - 10-5-2020 TO 11-15-2020 AT $5500.00 PER DAY | 5,500.00 | 231,000.00 |

| | |
|---|---|
| Subtotal | 323,000.00 |
| Sales Tax | |
| Total Invoice Amount | 323,000.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

| TOTAL | 323,000.00 |
|---|---|

*Emailed to Jay for Approval*

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:    985-563-7801
Fax:      985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1557 |
| Invoice Date: | Nov 23, 2020 |
| Page: | 1 |

**Bill To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

**Ship To:**
JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| Customer ID | | Payment Terms |
|---|---|---|
| JAB | | Net 30 Days |

| Sales Rep ID | Shipping Method | Ship Date | Due Date |
|---|---|---|---|
| | NONE | | 12/23/20 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | DB SPREAD HOURS | DERRICK BARGE SPREAD TO PERFORM REMOVAL OF HI 370-A. PERFORM WORK AS DIRECTED BY JAB. 11-1-2020 TO 11-15-2020 AS PER ATTACHED SPREADSHEET | 1,754,772.00 | 1,754,772.00 |

| | |
|---|---|
| Subtotal | 1,754,772.00 |
| Sales Tax | |
| Total Invoice Amount | 1,754,772.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

*Emailed to Jay for approval*

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1558 |
| Invoice Date: | Dec 10, 2020 |
| Page: | 1 |

| JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX 77385 | JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX 77385 |
|---|---|

| JAB | | Net 30 Days |
|---|---|---|
| | NONE | 1/9/21 |

| | | | | |
|---|---|---|---|---|
| | | HI 370-A CARGO BARGES MM 27 AND MM 262 WORKING ON THE PROJECT AS DIRECTED | | |
| 23.00 | DAYS CARGO BARGE | MM 262 - 11-16-2020 TO 12-8-2020 AT $5,500 PER DAY | 5,500.00 | 126,500.00 |
| 9.00 | DAYS CARGO BARGE | MM 27 - 11-16-2020 TO 11-24-2020 AT $2000 PER DAY.<br>MM 27 OFFLOADED AT DULAC AND OFF THE JOB 11-24-2020. | 2,000.00 | 18,000.00 |

| | |
|---|---|
| Subtotal | 144,500.00 |
| Sales Tax | |
| Total Invoice Amount | 144,500.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

Invoice Number: 1559
Invoice Date: Dec 10, 2020
Page: 1

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 1/9/21 |

| | | | | |
|---|---|---|---|---|
| 6.00 | DAYS DB SWING TIME | 11-16-20 TO 11-21-20 CONTINUE TOW AWAY FROM HI A 370-A AND STAND BY DUE TO FRONTAL SYSTEM COMING FOLLOWED BY TROPICAL STORM ETA. | 115,127.00 | 690,762.00 |
| -1.00 | CREDIT | 11-17-20 AND 11-18-20 CREDIT FOR WELDERS & RIGGERS BELOW CREW REQUIREMENTS. 10 SHORT WELDERS AT $48.00/HR. AND 12 SHORT RIGGERS AT $31.00/HR. | 20,448.00 | -20,448.00 |
| -1.00 | CREDIT | 11-19-20 TO 11-21-20 CREDIT FOR WELDERS AND RIGGERS. 11 SHORT WELDERS AT $48.00/HR. AND 10 SHORT RIGGERS AT $31.00/HR. | 30,168.00 | -30,168.00 |
| 10.00 | DB SPREAD HOURS | 11-22-20 TOWING BACK TO FIELD AND RETURNING BACK TO REMOVAL. 10 HRS WEATHER RATE X $4796.00/HR. | 4,796.00 | 47,960.00 |
| 14.00 | DB SPREAD HOURS | 11-22-20 TOWING BACK TO FIELD AND RETURNING BACK TO REMOVAL 14 HOURS WORK RATE X $5330.00/HR | 5,330.00 | 74,620.00 |
| 5.00 | DAYS DB SWING TIME | 11-23-20 TO 11-27-20 CONTINUE REMOVING HI A 370-A AS DIRECTED BY | 127,919.00 | 639,595.00 |

| | |
|---|---|
| Subtotal | Continued |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

# INVOICE

| | |
|---|---|
| Invoice Number: | 1559 |
| Invoice Date: | Dec 10, 2020 |
| Page: | 2 |

Voice: 985-563-7801
Fax: 985-563-4660

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 1/9/21 |

| | | | | |
|---|---|---|---|---|
| | | JAB. 5 DAYS FULL RATE X $127919.00/DAY | | |
| 6.00 | DB SPREAD HOURS | 11-28-20 WORKING FULL SPREAD REMOVING HI A 370-A PLATFORM 6 HRS. X $5330.00/HR | 5,330.00 | 31,980.00 |
| 18.00 | DB SPREAD HOURS | 11-28-20 GETTING ON TOW TO SHELTERED WATERS FOR NORTH EASTERN FRONT COMING THROUGH THE AREA. 18 HOURS WEATHER RATE X $4796.00/HR | 4,796.00 | 86,328.00 |
| 5.00 | DAYS DB SWING TIME | 11-29-20 TO 12-3-20 DOWNTIME FOR WEATHER NORTH EASTERN THAT STARTED 11-28-20 5 DAYS X $115127.00/DAY | 115,127.00 | 575,635.00 |
| -1.00 | CREDIT | 11-29-20 TO 12-3-20 CREDIT FOR WELDERS. 10 SHORT WELDERS X $48.00/HR | 28,800.00 | -28,800.00 |
| -1.00 | CREDIT | 11-29-20 TO 12-3-20 CREDIT FOR RIGGERS. 11 SHORT RIGGERS X $31.00/PER HR AS PER ATTACHED SPREAD SHEET | 20,460.00 | -20,460.00 |

| | |
|---|---|
| Subtotal | 2,047,004.00 |
| Sales Tax | |
| Total Invoice Amount | 2,047,004.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA  70361
USA

Voice:   985-563-7801
Fax:      985-563-4660

# INVOICE

Invoice Number:   1560
Invoice Date:       Dec 10, 2020
Page:                   1

| JAB ENERGY SOLUTIONS | JAB ENERGY SOLUTIONS |
|---|---|
| 19221 I 45 SOUTH STE. 200 | 19221 I 45 SOUTH STE. 200 |
| SHENANDOAH, TX  77385 | SHENANDOAH, TX  77385 |

| JAB | Net 30 Days |
|---|---|
| NONE | 1/9/21 |

| | | | | |
|---|---|---|---|---|
| 1.00 | DAYS DB SWING TIME | 12-4-20 HI A 370-A CONTINUE STAND BY DUE TO NORTH EAST FRONT THEN START TOW BACK TO LOCATION: 1 DAY @ $115127.00/DAY | 115,127.00 | 115,127.00 |
| -1.00 | CREDIT | 12-4-20 CREDIT FOR : 10 WELDERS X $48.00/HR X 12 = ($5760.00) & 11 RIGGERS X $31.00/HR X 12 = ($4092.00) | 9,852.00 | -9,852.00 |
| 2.00 | DAYS DB SWING TIME | 12-5-20 TO 12-6-20 RETURN BACK TO LOCATION AND STILL UNABLE TO WORK DUE TO WEATHER: 2 DAYS X $115127.00/DAY | 115,127.00 | 230,254.00 |
| 2.00 | DAYS DB SWING TIME | 12-7-20 TO 12-8-20 BACK WORKING ON PROJECT WITH FULL SPREAD: 2 DAYS X $127919.00/DAY | 127,919.00 | 255,838.00 |
| 1.00 | OTHER | 12-9-20 STARTED WORKING ON LUMP SUM DEMOBILIZATION OF THE DB SWING THOMPSON AND THE ANCHOR HANDLING TUG $150000.00 PER WORK ORDER. THIS IS THE FINAL INVOICE OF THE DB SWING THOMPSON AND ANCHOR | 150,000.00 | 150,000.00 |

| | |
|---|---|
| Subtotal | Continued |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC
P.O. BOX 9157
HOUMA, LA  70361
USA

Voice:   985-563-7801
Fax:      985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1560 |
| Invoice Date: | Dec 10, 2020 |
| Page: | 2 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

| JAB | | Net 30 Days |
|---|---|---|
| | NONE | 1/9/21 |

| | | HANDLING TUG FOR THE PROJECT. | | |
|---|---|---|---|---|
| | | | | |

| | |
|---|---|
| Subtotal | 741,367.00 |
| Sales Tax | |
| Total Invoice Amount | 741,367.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**



**TURNKEY OFFSHORE
PROJECT SERVICES, LLC**

**TOPS DB SWING THOMPSON
RELATED TO WORK FOR JAB AT HI A370-A**

**JAB ENERGY       HI A 370-A**

| DATE: | WEATHER DAY RATE: | WEATHER HOURLY RATE: | DAY RATE: | HOURLY RATE: | REASON: DB SWING THOMPSON AND ANCHOR HANDLING TUG TO PERFORM REMOVAL AS DIRECTED FOR JAB AT HI A 370-A | TOTAL COST: |
|---|---|---|---|---|---|---|
| | $115,127.00 | $4,796.00 | $127,919.00 | $5,330.00 | | |
| 12/4/20 | 1 DAY | | | | CONTINUE STANDBY DUE TO NORTH EAST FRONT THEN START TOW BACK TO LOCATION: 1 DAY @ $115127.00/DAY | $115,127.00 |
| 12/4/20 | | | | | CREDIT FOR:<br>10 WELDERS X $48.00/HR X 12 = ($5760.00)<br>11 RIGGERS X $31.00/HR X 12 = ($4092.00) | -$9,852.00 |
| 12-5-20 TO 12-6-20 | 2 DAYS | | | | RETURN BACK TO LOCATION AND STILL UNABLE TO WORK DUE TO WEATHER. 2 DAYS @115127.00/DAY | $230,254.00 |
| 12-7-20 TO 12-8-20 | | | 2 DAYS | | BACK WORKING ON PROJECT WITH FULL SPREAD<br>2 DAYS @ $127919.00 | $255,838.00 |
| 12/9/20 | | | | | STARTED WORKING ON LUMP SUM DEMOBILIZATION OF THE DB SWING THOMPSON AND THE ANCHOR HANDLING TUG $150000.00 PER WORK ORDER. | $150,000.00 |
| | | | | | THIS IS THE FINAL INVOICE OF THE DB SWING THOMPSON AND ANCHOR HANDLING TUG FOR THE PROJECT. | |
| | | | | | **TOTAL** | **$741,367.00** |

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC
P.O. BOX 9157
HOUMA, LA  70361
USA

Voice:  985-563-7801
Fax:    985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1561 |
| Invoice Date: | Dec 28, 2020 |
| Page: | 1 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 1/27/21 |

| | | | | |
|---|---|---|---|---|
| | | THIS INVOICE AND BACK UP TICKETS REPRESENT THE WORK PERFORMED SETTING UP THE CARGO BARGES TO RECEIVE THE HI A 370-A STRUCTURE. ALONG WITH BALLASTING THE BARGE AND PREPPING TRUNIONS FOR LIFTING THE STRUCTURE, IT ALSO INCLUDES REMOVING ALL THOSE MATERIALS AT THE END OF THE PROJECT. | | |
| 402.00 | HOURS REGULAR | HI A370-A WORK DONE AT HOPE SERVICES DULAC, LA YARD AS PER ATTACHED TICKETS | 55.00 | 22,110.00 |
| 28.00 | HOURS OVERTIME | WORK DONE AT HOPE SERVICES DULAC, LA YARD AS PER ATTACHED TICKETS. | 75.00 | 2,100.00 |
| 23.00 | HOURS EQUIPMENT | FORKLIFT TIME AS PER ATTACHED TICKETS | 45.00 | 1,035.00 |
| 13.00 | HOURS EQUIPMENT | CHERRY PICKER TIME AS PER ATTACHED TICKETS | 75.00 | 975.00 |
| 42.00 | HOURS EQUIPMENT | 400 TON CRANE TIME AS PER ATTACHED TICKETS | 450.00 | 18,900.00 |
| 2.00 | HOURS EQUIPMENT | DB 23 CRANE TIME AS PER ATTACHED TICKETS | 1,000.00 | 2,000.00 |

| | |
|---|---|
| Subtotal | Continued |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

Invoice Number:   1561
Invoice Date:     Dec 28, 2020
Page:             2

| JAB ENERGY SOLUTIONS 19221 I 45 SOUTH STE. 200 SHENANDOAH, TX 77385 | JAB ENERGY SOLUTIONS 19221 I 45 SOUTH STE. 200 SHENANDOAH, TX 77385 |
|---|---|

| JAB | | Net 30 Days |
|---|---|---|
| | NONE | 1/27/21 |

| | | | | |
|---|---|---|---|---|
| 2.00 | HOURS EQUIPMENT | AIR COMPRESSOR TIME AS PER ATTACHED TICKETS. | 250.00 | 500.00 |
| 1.00 | MATERIALS | ACME TRUCKLINE INVOICE 5883194 TRUCKING FOR TRUNIONS. | 757.35 | 757.35 |

| Subtotal | 48,377.35 |
|---|---|
| Sales Tax | |
| Total Invoice Amount | 48,377.35 |
| Payment/Credit Applied | |

Check/Credit Memo No:

Exhibit E

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice: 985-563-7801
Fax: 985-563-4660

# INVOICE

| Invoice Number: | 1562 |
| Invoice Date: | Dec 29, 2020 |
| Page: | 1 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX 77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 1/28/21 |

| 10.00 | OTHER | HI A370-A RENTAL OF THE MM 262 FROM 12-9-2020 TO 12-18-2020 THIS IS THE FINAL BILL ON CARGO BARGES. | 5,500.00 | 55,000.00 |
|---|---|---|---|---|

| | | |
|---|---|---|
| Subtotal | | 55,000.00 |
| Sales Tax | | |
| Total Invoice Amount | | 55,000.00 |
| Payment/Credit Applied | | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA  70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

| | |
|---|---|
| Invoice Number: | 1563 |
| Invoice Date: | Dec 30, 2020 |
| Page: | 1 |

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

JAB ENERGY SOLUTIONS
19221 I 45 SOUTH STE. 200
SHENANDOAH, TX  77385

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 1/29/21 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | THIRD PARTY CHARG | HI A370-A INVOICE FOR THIRD PARTY SERVICES OF DOCK CHARGES, FUEL FOR CARGO BARGE TUGS, CREW BOATS AND FUEL USED PLUS VERSBAR RIGGING. AS PER ATTACHED TICKET AND BACKUP INVOICES. | 189,222.47 | 189,222.47 |

| | |
|---|---|
| Subtotal | 189,222.47 |
| Sales Tax | |
| Total Invoice Amount | 189,222.47 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

# TURNKEY OFFSHORE PROJECT SERVICES, LLC

P.O. BOX 9157
HOUMA, LA 70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

Invoice Number:   1565
Invoice Date:   Jan 20, 2021
Page:   1

| JAB ENERGY SOLUTIONS |
| --- |
| 19221 I 45 SOUTH STE. 200 |
| SHENANDOAH, TX 77385 |

| JAB ENERGY SOLUTIONS |
| --- |
| 19221 I 45 SOUTH STE. 200 |
| SHENANDOAH, TX 77385 |

| JAB | | DUE UPON RECEIPT |
| --- | --- | --- |
| | NONE | 2/19/21 |

| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0100007-IN DATED 10-5-2020 | 6,162.50 | 6,162.50 |
| --- | --- | --- | --- | --- |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0100049-IN DATED 10-15-2020 | 78,498.00 | 78,498.00 |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0100101-IN DATED 10-31-2020 | 96,000.00 | 96,000.00 |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0011015-IN DATED 11-10-2020 | 46,248.00 | 46,248.00 |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0011039-IN DATED 11-16-2020 | 33,378.00 | 33,378.00 |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0011092-IN DATED 11-30-2020 | 90,000.00 | 90,000.00 |
| 1.00 | THIRD PARTY CHARG | HI 370-A CARGO BARGE TUGS CROSBY TUGS INVOICE #0120011-IN DATED 12-14-2020 THIS INVOICE IS FOR THE INVOICES THAT WERE PASSED TO JAB FOR DIRECT PAY, BUT NOW IS BEING BILLED FROM TOPS. | 10,150.00 | 10,150.00 |

Check/Credit Memo No:

| Subtotal | 360,436.50 |
| --- | --- |
| Sales Tax | |
| Total Invoice Amount | 360,436.50 |
| Payment/Credit Applied | |

Exhibit E

**TURNKEY OFFSHORE PROJECT SERVICES, LLC**
P.O. BOX 9157
HOUMA, LA  70361
USA

Voice:   985-563-7801
Fax:     985-563-4660

# INVOICE

Invoice Number:  1566
Invoice Date:    Feb 12, 2021
Page:            1

| JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 | JAB ENERGY SOLUTIONS<br>19221 I 45 SOUTH STE. 200<br>SHENANDOAH, TX  77385 |
|---|---|

| JAB | | Net 30 Days | |
|---|---|---|---|
| | NONE | | 3/14/21 |

| | THIRD PARTY CHARG | THIS INVOICE IS FOR BOAT CHARGES THAT WERE FOUND DURING AN AUDIT AND HAVE NOT BEEN BILLED YET. | | |
|---|---|---|---|---|
| 1.00 | THIRD PARTY CHARG | PATRIOT MARINE INVOICE #951 FOR $9240.00 PLUS 10% = $10164.00 AS PER ATTACHED INVOICE AND DJR'S. | 10,164.00 | 10,164.00 |
| 1.00 | THIRD PARTY CHARG | PATRIOT MARINE INVOICE #948 FOR $11742.50 PLUS 10% = $12916.75 AS PER ATTACHED INVOICE AND DJR'S. | 12,916.75 | 12,916.75 |
| 1.00 | THIRD PARTY CHARG | PATRIOT MARINE INVOICE #922 FOR $4637.50 PLUS 10% = $5101.25 AS PER ATTACHED INVOICE AND DJR'S | 5,101.25 | 5,101.25 |

| Subtotal | 28,182.00 |
|---|---|
| Sales Tax | |
| Total Invoice Amount | 28,182.00 |
| Payment/Credit Applied | |

Check/Credit Memo No:

**Exhibit E**

| | | | | | TOPS LLC invoicing for jab project hi a 370 a | | |
|---|---|---|---|---|---|---|---|

**Revised Date Feb 16, 2021**

| INV DATE | INV # | BILLED | CREDITS | PAID | TOTAL OWED | Description |
|---|---|---|---|---|---|---|
| 11/16/2020 | 1551 | $ 469,970.00 | $ - | $ (469,970.00) | $ - | invoice for DBST mobilization and 3 dbst days on project |
| 11/19/2020 | 1552 | $ 120,277.55 | | $ (120,277.55) | $ - | support vessels and fuel |
| 11/19/2020 | 1553 | $ 86,615.85 | $ (21,386.75) | $ (29,722.45) | $ 35,506.65 | tail tugs assist db swing and for cargo barges (hurricanes) |
| 11/19/2020 | 1554 | $ 3,101,958.00 | $ (201,287.00) | | $ 2,900,671.00 | dbst and AHT 10-7 through 10-31 on project |
| 11/19/2020 | 1555 | $ 58,372.60 | | | $ 58,372.60 | dock charges db stand by for hurricane. |
| 11/23/2020 | 1556 | $ 323,000.00 | | | $ 323,000.00 | mm27 10-1 to 11-15 and mm262 10-5 to11-15 |
| 11/23/2020 | 1557 | $ 1,754,772.00 | | | $ 1,754,772.00 | dbst and AHT 11-1 through 11-15 on project  has credits |
| 11/1/2020 | 1558 | $ 144,500.00 | | | $ 144,500.00 | mm27 11-16 to 11-24 and mm262 11-16 to 12-8 |
| 12/1/2020 | 1559 | $ 2,047,004.00 | | | $ 2,047,004.00 | dbst and AHT 11-16 through 12-3 on project  has credits |
| 12/10/2020 | 1560 | $ 741,367.00 | | | $ 741,367.00 | dbst and AHT 12-04 through demob 12-9  has credits |
| 12/28/2020 | 1561 | $ 48,377.35 | | | $ 48,377.35 | Hope services to prep barges/trunions and clean barges off |
| 12/29/2020 | 1562 | $ 55,000.00 | | | $ 55,000.00 | rental mm262 12-9  up to 12-18  and final clean off of barge |
| 12/30/2020 | 1563 | $ 189,222.47 | | | $ 189,222.47 | 3rd party charges tugs, fuel, docks and crewboats, rigging |
| 1/20/2021 | 1565 | $ 360,436.50 | | | $ 360,436.50 | 3rd party charges cargo barge tugs, crosby tugs invoices |
| 2/12/2021 | 1566 | $ 28,128.00 | | | $ 28,128.00 | 3rd party charges for patriot marine invoices |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 2/16/2021 | | | ($166,050.00) | | ($166,050.00) | credit 2214 tons @ $75.00 per ton for scrap iron as per Reliant ticket |
| 11/20/2020 | 10064 | | $ (86,160.00) | | $ (86,160.00) | credit labor sent home during first storm downtime inv.# 1554 |
| 12/16/2020 | 10066 | | $ (19,442.00) | | $ (19,442.00) | credit for double charge of assist tug on invoice 1553 |
| 12/18/2020 | 10065 | | $ (115,127.00) | | $ (115,127.00) | credit for weather rate errors on invoice 1554 |
| 1/20/2021 | 10067 | | $ (1,944.75) | | $ (1,944.75) | credit for 10% charge on invoice 1553 |
| | | | | | $ - | |
| | | | | | | |
| GRAND TOTAL | | $ 9,529,001.32 | ($388,723.75) | | $ 8,297,633.82 | TOTAL DUE |
| | | | | | | |
| TOTAL BILLED W/CREDITS | | $ 9,140,277.57 | | | | |

**Exhibit F**




**TURNKEY OFFSHORE
PROJECT SERVICES, LLC**

*Dr. Swing Thompson*

## TOPS
P.O. Box 9157, Houma, LA 70361
Phone 985-563-7801 Fax 985-563-4660

December 16, 2020

Attn: Brent Boudreaux

JAB Energy Solutions, LLC
19221 I45 South
Suite 324
Shenandoah, Texas  77385

RE: HI 370-A Removal

Brent,

We are all aware of the Havoc the storms have done to the cost of the project at HI A 370-A.

Rocky has asked that I start working with you to come up with a spread sheet of when you estimate the payments will come. Of course that means laying all the cards on the table.  Is it possible that you could provide an excel schedule of how you see the payments coming to TOPS based on the billing we have sent you thus far and could you show on that statement your debt to others regarding this project, with their payment schedules and where shortages may be.

Our intent is not to be intrusive.  We have to do our own in house budgeting of the vendors we owe and so do they.  We also want to help keep all our companies afloat by working with you on percentages paid to each entity so payments are fair and equitable.  So no one should fail.  Direct open communication is going to be the best way to do this.

Your earliest response would be appreciated.

Regards,

Jay Henderson
Vice President

**Exhibit G**

# NALLEY and DEW
### A PROFESSIONAL LAW CORPORATION
SUITE 100
2450 SEVERN AVENUE
METAIRIE, LOUISIANA 70001

GEORGE J. NALLEY, JR. [1]
DONA J. DEW [2]
ANDREW J. MINER [3]
SARAH L. CHANCELLOR

TELEPHONE: (504) 838-8188
FACSIMILE:  (504) 838-0008

[1] ALSO ADMITTED IN THE STATE OF TEXAS
[2] ALSO ADMITTED IN THE STATES OF FLORIDA AND TEXAS
[3] ALSO ADMITTED IN THE STATE OF MISSISSIPPI

March 2, 2021

bboudreaux@jabenergysolutions.com
Brent Boudreaux
JAB Energy Solutions, LLC
19221 I 45 South
Suite 200
Shenendoah, Texas 77385

Re: H.I. 370-A Removal
Our File #59.03

Dear Brent:

This letter is to advise you that we have been retained by TOPS to assist them in the collection of the very large bill owed to them for their work for you last fall. I believe that TOPS is currently owed $8,297,633 for their work, which demand for payment has been made multiple times with no payments whatsoever made so far.

I understand that you have been in communications with both Jay and Rocky Henderson regarding the situation and most recently have submitted to them a spreadsheet showing the contractors owed by you for this project, totaling $11,449,919.47, as well as your spreadsheet for available funds to pay the vendors of $6,056,412, which obviously is a significant short-fall.

As you know, the Hendersons and TOPS have been very patient in working with you; however, the repeated delays in projected dates for payments is becoming very problematic. Accordingly, we are requesting a specific schedule from you as to when we can expect payments to TOPS to begin and on what schedule. It is my understanding that you have indicated that you have indicated you may pay one or more of your vendors in whole, to which we specifically object to. More particularly, according to the spreadsheet I have reviewed, approximately 73% of your total costs on this project are owed to TOPS. Accordingly, at the very least TOPS demands that they be paid 73% of the available funds as they are dispersed. Any disbursement to TOPS at a lower pro rata percentage is totally unacceptable. In fact, TOPS believes that we are entitled to a higher percentage disbursement, as it was only through TOPS' willingness to work with you in the final stages of this job after you disclosed that you were unable to pay them what you had

<span style="color:red">**Exhibit H**</span>

March 2, 2021
Page 2

contracted to do, they continued with and completed the project for you. Had TOPS pulled off of the project at that point, as they certainly would have been entitled to do given your failure to disclose the severe financial difficulties you were having, no one would be in a position to collect anything. Accordingly, we believe that TOPS' willingness to work with you and their work on the project entitles them to a lodestar payment of at least $5,000,000 from the available funds.

The status of this unpaid balance is obviously of high priority to TOPS, as your failure to pay them the contracted amounts has created significant financial difficulties for them as well. Accordingly, I ask that you provide me a response to this inquiry by the close of business on Friday. Should you have any questions or need any further information, please do not hesitate to contact me.

Cordially,

GEORGE J. NALLEY, JR.

GJN/kmj

cc:    Mr. Rocky Henderson
       Mr. Jay Henderson

**Exhibit H**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TURNKEY OFFSHORE PROJECT | * | NO: |
| SERVICES, LLC ("TOPS") | * | |
| | * | JUDGE |
| VERSUS | * | |
| | * | |
| JAB ENERGY SOLUTIONS, LLC | * | MAGISTRATE |
| and BRENT BOUDREAUX, | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## **VERIFICATION**

COMES NOW Jay Henderson, the Vice President of Turnkey Offshore Project Services, LLC, and verifies that he has read the foregoing Complaint and knows the contents thereof; that the same are true and correct except those allegations made on information and belief, and those he verily believes to be true.

I, Jay Henderson, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this the 24 day of March, 2021.

_____

**JAY HENDERSON**

Sworn to and Subscribed Before me, this 24 day of March, 2021

_____
NOTARY PUBLIC  Christina P Jones

_____
131822
Notary ID/ Bar Roll No.

_____
At Death
Commission Expiration Date

1

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Turnkey Offshore Project Services, LLC (TOPS)

## DEFENDANTS

JAB Energy Solutions, LLC and Brent Boudreaux

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Shenandoah, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
George Nalley and Andrew Miner, Nalley and Dew, APLC
2450 Severn Ave., Ste. 100, Metairie, LA 70001
(504) 838-8188

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☒ 120 Marine | ☐ 310 Airplane ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine     Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1333(1)

Brief description of cause:
Breach of a maritime contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
04/01/2021

SIGNATURE OF ATTORNEY OF RECORD
*George Nalley*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____